1 | THE WESTON FIRM
2 | GREGORY S. WESTON (239944)
3 | 5127 Lotus Street
San Diego, CA 92107
4 | Telephone: 619 255 7098
Fax:        480 247 4553
5 | greg@westonfirm.com

6 | BECK & LEE BUSINESS TRIAL LAWYERS
7 | JARED H. BECK (233743)
8 | 28 West Flagler Street, Suite 555
Miami, FL 33130
9 | Phone: 305 789 0072
10 | Fax: 786 664 3334
jared@beckandlee.com

11 | Counsel for Plaintiffs

12 |

BY ___
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
2009 OCT 28 PM 1:57
FILED

13 | UNITED STATES DISTRICT COURT
14 | CENTRAL DISTRICT OF CALIFORNIA

15 |

16 | EVANGELINE RED, JENNIFER RED, and RACHEL WHITT, on Behalf of
17 | Themselves and All Others Similarly
18 | Situated,

19 |                          Plaintiffs,

20 |              v.

21 |

22 | UNILEVER UNITED STATES, INC. and UNILEVER PLC,

23 |

24 |                          Defendants.

Case No. **CV09 07855 MMM (AGRx)**

CLASS ACTION

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE LANHAM ACT, THE UNFAIR COMPETITION LAW, THE COMMON LAW OF UNFAIR COMPETITION, THE FALSE ADVERTISING LAW, AND THE CONSUMER LEGAL REMEDIES ACT

DEMAND FOR JURY TRIAL

25 |
26 |
27 |
28 |

Plaintiffs Evangeline Red, Jennifer Red, and Rachel Whitt ("Plaintiffs"), on behalf of themselves, all others similarly situated, and the general public, by and through undersigned counsel, hereby sue Defendants Unilever United States Inc. and Unilever PLC (collectively referred to herein as "Unilever") and, upon information and belief and investigation of counsel, allege as follows:

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over this action under 28 U.S.C. §1331 and 15 U.S.C. §1121.

12.     This Court also has original jurisdiction under 28 U.S.C. §1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs. Further, more than two-thirds of the members of the Class reside in states other than the states of which Defendants are citizens.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Plaintiffs reside in and suffered injuries as a result of Defendants' acts in this district, many of the acts and transactions giving rise to this action occurred in this district, and Defendants (1) are authorized to conduct business in this district and have intentionally availed themselves of the laws and markets of this district through the promotion, marketing, distribution, and sale of their products in this district; (2) reside in this district; and (3) are subject to personal jurisdiction in this district.

## INTRODUCTION

1.     Plaintiffs Evangeline Red, Jennifer Red, and Rachel Whitt repeatedly purchased margarines made by Unilever in California during the class period defined herein. Unilever falsely markets its margarines as healthful despite the fact

COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

1

1   its margarines have dangerous levels of artificial trans fat, a toxic food additive
2   banned in many parts of the world.

3       2.    Unilever specifically markets its margarines as good for
4   cardiovascular health.

5       3.    One method Unilever uses is to compare the nutritional value of
6   diluted margarine to the nutritional value of undiluted butter using non-standard
7   and deceptive charts that fail to compare the products' actual trans fat content.

8       4.    Unilever further misleads consumers by marketing its margarines as
9   "cholesterol free," implying its products are desirable for those with high blood
10  cholesterol levels.

11      5.    This is highly deceptive, as direct consumption of dietary cholesterol
12  has long been known not to affect serum cholesterol levels. In contrast, the trans
13  fat in Unilever margarines raises the risk of coronary heart disease, and does so
14  more than any other known nutritive product through the doubly dangerous effect
15  of both raising "bad" LDL cholesterol and lowering "good" HDL cholesterol blood
16  levels.

17      6.    Other deceptive acts include using words such as "natural" and
18  "nutritious" to describe products with artificial tans fat and adding images of hearts
19  and addresses of nutrition websites to the labels.

20      7.    Absent these material deceptions, misstatements, and omissions,
21  Plaintiffs and other Class members would not have purchased these Unilever
22  margarines.

23      8.    Plaintiffs seek an order that compels Unilever to (1) cease marketing
24  its margarines using the misleading tactics complained of herein, (2) conduct a
25  corrective advertising campaign, (3) restore the amounts by which Unilever was
26  unjustly enriched, (4) destroy all misleading and deceptive materials and products,
27  and (5) compensate Plaintiffs and the Plaintiff Class for purchasing and consuming

28

1  these products.

2

3  **PARTIES**

4  9.    Defendant Unilever United States Inc. ("Unilever U.S.") is a

5  Delaware corporation with its principal place of business in California. Unilever

6  U.S. is the manufacturer of I Can't Believe It's Not Butter! Light, I Can't Believe

7  It's Not Butter! Original, I Can't Believe It's Not Butter! Cooking and Baking

8  Sticks, Shedd's Spread Country Crock, Shedd's Spread Country Crock Spreadable

9  Sticks, Brummel & Brown, and Imperial Margarine (collectively "Unilever

10  Margarines").

11  10.   Defendant Unilever PLC is a United Kingdom corporation with its

12  principal place of business in California.

13  11.   Unilever PLC owns and controls Unilever U.S.

14  12.   Plaintiffs are residents of Los Angeles County who repeatedly

15  purchased Unilever margarines in various California stores during the class period

16  defined below.

17

18  **SUMMARY OF THE STRONG EVIDENCE OF HEALTH**
    **DANGERS OF ARTIFICIAL TRANS FAT**

19

20  **Artificial trans fat is a manufactured food product whose basic chemical**
    **structure is different from natural fat molecules.**

21

22  13.   Trans fat is naturally found in trace amounts in food derived from

23  ruminant animals, primarily in red meat.[1]

24  14.   Artificial trans fat is manufactured in an industrial process called

25  hydrogenation, in which hydrogen atoms are added to normal vegetable oil by

26  _____
    [1] Mozaffarian , 354 New Eng. J. Med. at 1608.

27

28  COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF
    UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

3

heating the oil to temperatures above 400 degrees Fahrenheit in the presence of ion donor catalyst metals such as rhodium, ruthenium, and nickel.[2]

15.     Nearly all the trans fat in the U.S. diet is the artificial fat present in partially hydrogenated vegetable oil ("PHVO").[3]

16.     PHVO was invented in 1901 and patented in 1902 by German chemist Wilhelm Normann. Trans fat molecules chemically differ from the natural fat molecules in other food products, as shown in the illustrations that follow.

17.     Natural fat, except the trace amounts of natural trans fat from ruminant animals, comes in two varieties: (1) fats that lack carbon double bonds ("saturated fat") and (2) fats that have carbon double bonds with the hydrogen atoms on the same side on the carbon chain ("cis fat"). Trans fat, however, has double bonds on opposite sides of its carbon chain.



Saturated fat

$CH_3$ — COOH

● = Hydrogen atom   ● = Carbon atom

---

[2] *See* Alice H. Lichtenstein, *Trans Fatty Acids, Plasma Lipid Levels, and Risk of Developing Cardiovascular Disease*, 95 Circulation 2588, 2588-90 (1997).

[3] *See* Mozaffarian, 354 New Eng. J. Med. at 1608.





18. PHVO was initially a "wonder product" very attractive to the packaged food industry because it combines the low cost of unsaturated cis fat with the flexibility and long shelf life of saturated fat. Like cis fat, PHVO is manufactured from lower-cost legumes,[4] while saturated fat is made from higher-cost animal and tropical plant sources.[5]

---

[4] e.g., corn oil, soybean oil, peanut oil

[5] e.g., butter, cream, tallow, coconut oil

COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

5

19.    Like natural saturated fat, PHVO has a long shelf life, physical solidity, and flavor stability. The industrial process that adds hydrogen ions to normal vegetable oil improves food texture and permits food products to withstand heavy mechanical processing and high temperatures.[6] Given its versatility, PHVO was recently used in 40 percent of processed packaged foods.[7]

20.    Artificial trans fat does not exist in nature, and the human body has not evolved to digest it. The same unusual and unnatural chemical structure that gives artificial trans fat these properties attractive from an industrial perspective make it highly toxic to human health.

**Trans fat causes cardiovascular disease, type 2 diabetes, and cancer.**

- **Heart Disease**

21.    In a joint Dietary Guidelines Advisory Committee Report, the U.S. Department of Health and Human Services and the U.S. Department of Agriculture recognized **"[t]he relationship between trans fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular disease."**[8]

---

[6] *See* Alberto Ascherio *et al.*, *Trans Fatty Acids & Coronary Heart Disease*, 340 New Eng. J. Med. 94, 94-8 (1999). *See also* Ctr. for Food Safety & Applied Nutrition, U.S. Food & Drug Admin., Questions & Answers About Trans Fat Nutrition Labeling (Update 2006) (2003), *available at* http://www.cfsan.fda.gov/%7Edms/qatrans2.html#fn.

[7] Mary Carmichael, *The Skinny on Bad Fat*, Newsweek, Dec. 1, 2003, at 66. *See also* Kim Severson, *Hidden Killer. It's **Trans** Fat. It's Dangerous. And It's In Food You Eat Every Day*, S.F. Chron., Jan. 30, 2002.

[8] Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee Report, Section 10 (2005).

COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

6

22.    Food products with trans fat harm the heart by "rais[ing] the concentration of the most dangerous form of serum cholesterol (LDL cholesterol)" and "lower[ing] a protective form of serum cholesterol (HDL cholesterol)."[9]

23.    The American Heart Association notes **"trans fats raise your bad (LDL) cholesterol levels and lower your good (HDL) cholesterol levels. Eating trans fats increases your risk of developing heart disease."**[10]

24.    After an extensive evaluation of the scientific literature on the trans fat/CHD connection, the FDA concluded:

...based on the consistent results across a number of the most persuasive types of study designs (i.e., intervention trials and prospective cohort studies) that were conducted using a range of test conditions and across different geographical regions and populations...the available evidence for an adverse relationship between trans fat intakes and CHD risk is strong.[11]

25.    Trans fat raises the risk of CHD more than any other known nutritive product.[12]

26.    Removing 2% of daily calories from trans fat from the American diet "would prevent approximately 30,000 premature coronary deaths per year, and epidemiologic evidence suggests this number is closer to 100,0000 premature deaths annually."[13]

---

[9] *Id.*

[10] Am. Heart Ass'n., *Trans Fat Overview*, *available at* http://www.americanheart.org/presenter.jhtml?identifier=3045792.

[11] Ctr. for Food Safety & Applied Nutrition, U.S. Food & Drug Admin., Questions & Answers About Trans Fat Nutrition Labeling.

[12] Mozaffarian, 354 New Eng. J. Med. at 1603.

[13] Alberto Ascherio *et al.*, *Trans Fatty Acids & Coronary Heart Disease*, 340 New Eng. J. Med. 94, 94-8 (1999).

27.    A study on the impact of trans fatty acids on heart health provides the evidence that:

> [E]ven the lower estimates from the effects [of PHVO] on blood lipids would suggest that more than 30,000 deaths per year may be due to the consumption of partially hydrogenated vegetable fat. Furthermore, the number of attributable cases of nonfatal coronary heart disease will be even larger. [14]

28.    Since "the adverse effect of trans fatty acids is stronger than that of saturated fatty acids," saturated fat consumption would need to be reduced by 10 percent of caloric intake to have the same impact.[15]

29.    After analyzing four large studies, researchers found that increasing the intake of trans fat by 2 percent of calories consumed raises the risk of CHD by 23 percent.[16] In fact, "10 to 19 percent of CHD events in the United States could be averted by reducing the intake of trans fat."[17]

30.    By raising HDL levels and lowering LDL levels, trans fat causes a wide variety of dangerous heart conditions, including low flow-mediated vasodilation, coronary artery disease, and primary cardiac arrest.

31.    After conducting a crossover diet trial, Danish researchers determined that healthy men and women who maintained a high-trans fat diet had 21 percent lower protective HDL levels and 29 percent lower flow-mediated vasodilation ("FMD") than those on a high-saturated fat diet. Since FMD measures the percent

---

[14] W.C. Willett *et al.*, *Trans Fatty Acids: Are the Effects only Marginal?* 84 Am. J. Pub. Health  722, 723 (1994).

[15] Mozaffarian, 354 New Eng. J. Med. at 1609.

[16] Jonathan E. Fielding, *Report to Los Angeles County Board of Supervisors: Trans Fat Regulation and Calorie Labeling* (2007). *See also* Mozaffarian, 354 New Eng. J. Med. at 1613.

[17] *See* Mozaffarian, 354 New Eng. J. Med. at 1611.

1    increase between the diameter of the artery at ordinary and at maximum dilation,

2    low FMD is "a risk marker of coronary heart disease.[18]

3         32.     Australian researchers observed that heart attack patients possess

4    elevated amounts of trans fat in their adipose tissue, strongly linking heart disease

5    with long-term consumption of trans fat.[19]

6         33.     By taking blood samples from 179 survivors of cardiac arrest and 285

7    randomly-selected control patients and comparing the top fifth with the bottom

8    fifth of participants by trans fat intake, another study published in the American

9    Heart Association's *Circulation* found that the largest consumers of trans fat have

10    three times the risk of suffering primary cardiac arrest, even after controlling for a

11    variety of medical and lifestyle risk factors.[20]

12

13     •   **Diabetes**

14         34.     Artificial trans fat causes type 2 diabetes.[21]

15         35.     A 14-year study of 84,204 women found that for every 2 percent

16    increase in energy intake from trans fat, the relative risk of type 2 diabetes was

17    1.39. In other words, consuming 2 percent of energy from artificial trans fat

18

19 [18] Nicole M. De Roos *et al*., *Replacement of Dietary Saturated Fatty Acids by*

20 *Trans Fatty Acids Lowers Serum HDL Cholesterol and Impairs Endothelial*

21 *Function in Healthy Men and Women*, 21 Am. Heart Assoc. 1233, 1233-37

22 (2001).

[19] Peter M. Clifton *et al*., *Trans Fatty Acids In Adipose Tissue And The Food*

23 *Supply Are Associated With Myocardial Infarction*. 134 J. of Nutrition 874, 874-79

24 (2004).

[20] Rozenn N. Lemaitre *et al*., *Cell Membrane Trans-Fatty Acids and the Risk of*

25 *Primary Cardiac Arrest*, 105 Circulation 697, 697-701 (2002).

26 [21] Am. Heart Ass'n., *Trans Fat Overview*.

27

28 COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

9

increases the risk of type 2 diabetes by 39 percent.[22]

- **Cancer**

36.  Trans fat is a known carcinogen shown to cause breast, prostate, and colorectal cancer.

37.  A 13-year study of 19,934 French women showed 75 percent more women contracted breast cancer in the highest quintile of trans fat consumption than did the lowest.[23]

38.  In a 25-year study of 14,916 U.S. physicians, the doctors in the highest quintile of trans fat intake had over a 100% greater risk of developing prostate cancer than the doctors in the lowest quintile.[24]

39.  A study of 1,012 American males looking at trans fat intake and the risk of prostate cancer found "[c]ompared with the lowest quartile of total trans-fatty acid consumption, the higher quartiles gave odds ratios (ORs) equal to 1.58.," meaning those in the highest quartile are 58% more likely to contract prostate cancer.[25]

40.  A 600-person study found an 86 percent greater risk of colorectal

---

[22] Jorge Salmeron *et al.*, *Dietary Fat Intake and Risk of Type 2 Diabetes in Women*, 73 Am. J. of Clinical Nutrition 1019, 1023 (2001).

[23] Véronique Chajès *et al.*, *Association between Serum Trans-Monounsaturated Fatty Acids and Breast Cancer Risk in the E3N-EPIC Study.* 167 Am. J. of Epidemiology 1312, 1316 (2008).

[24] Jorge Chavarro *et al.*, *A Prospective Study of Blood Trans Fatty Acid Levels and Risk of Prostate Cancer.*, 47 Proc. Am. Assoc. of Cancer Research 95, 99 (2006).

[25] Xin Liu *et al.*, *Trans-Fatty Acid Intake and Increased Risk of Advanced Prostate Cancer: Modification by RNASEL R462Q Variant*, 28 Carcinogenesis 1232, 1232 (2007).

COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

10

cancer in the highest trans fat consumption quartile.[26]

41.     A   2,910-person   study   found   "trans-monounsaturated   fatty acids…were   dose-dependently   associated   with   colorectal   cancer   risk,"   which showed "the importance of type of fat in the etiology and prevention of colorectal cancer."[27]

42.     The serious health conditions caused by trans fat consumption only occur from artificial trans fat, not the trace natural trans fat found in ruminant sources:

> Of four prospective studies evaluating the relation between the intake of  trans fatty acids from ruminants and the risk of CHD, none identified a significant positive association, whereas three identified nonsignificant trends toward an inverse association. … [T]he sum of the current evidence suggests that the public health implications of consuming trans fats from ruminant products are relatively limited.[28]

**The grave, concrete risks of artificial trans fat consumption far outweigh any conceivable benefits of Unilever's conduct.**

43.     There is no health benefit to trans fat consumption and "no safe level" of trans fat intake.[29]

44.     According to the established consensus of the scientific community,

---

[26] L.C. Vinikoor *et al.*, *Consumption of Trans-Fatty Acid and its Association with Colorectal Adenomas*, 168 Am. J. of Epidemiology 289, 294 (2008).

[27] Evropi Theodoratou *et al.*, *Dietary Fatty Acids and Colorectal Cancer: A Case-Control Study*, 166 Am. J. of Epidemiology 181 (2007).

[28] Mozaffarian, 354 New Eng. J. Med. at 1608-1609.

[29] Food & Nutrition Bd., Inst. of Med., Dietary Reference Intakes For Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids (2005).

COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

11

consumers should keep their consumption of trans fat "as low as possible."[30]

45.     As Mozaffarian notes in the New England Journal of Medicine:

[T]rans fats from partially hydrogenated oils have no intrinsic health value above their caloric value. Thus, from a nutritional standpoint, the consumption trans fatty acids results in considerable potential harm but no apparent benefit. … Thus, complete or near-complete avoidance of industrially produced trans fat—a consumption of less than 0.5 percent of the total energy intake—may be necessary to avoid adverse effects and would be prudent to minimize health risks.[31]

**Trans fat is so inherently dangerous that it is being banned in an increasing number of American states and European countries.**

46.     In 2008, California became the first state to ban all restaurant food with artificial trans fat, a law affecting approximately 88,000 eating establishments. Trans fats will not be permitted in restaurants starting January 1, 2010 or retailers starting  January 1, 2011.

47.     New York City banned all trans fat in its 20,000 food establishments in 2006. Similar laws exist in Philadelphia; Baltimore; Stamford, Connecticut; and Montgomery County, Maryland.

48.     A 2004 Danish law restricted all foods to under 2 percent of calories from trans fat, a standard none of the Unilever products described below meet. Switzerland made the same restriction in 2008.[32]

---

[30] Food & Nutrition Bd., Inst. of Med., Dietary Reference Intakes For Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids 424 (2005).

[31] Mozaffarian , 354 New Eng. J. Med. at 1609.

[32] Andrew Collier, *Deadly Fats: Why Are We still Eating Them?*, The Independent (UK), June 10, 2008.

49.     After conducting a surveillance study of Denmark's trans fat ban, researchers concluded the change "did not appreciably affect the quality, cost or availability of food" and did not have "any noticeable effect for the consumers."[33]

50.     In 2006, a trans fat task force co-chaired by Health Canada and the Heart and Stroke Foundation of Canada recommended capping trans fat content at 2 percent of calories for tub margarines and spreads and at 5 percent for all other foods. On September 30, 2009, British Columbia became the first province to impose these rules on all restaurants, schools, hospitals, and special events.[34]

51.     In summary, Unilever's supposedly "nutritious" and "natural" margarines have so much toxic artificial trans fat they would be illegal to sell in many parts of the world.

**Direct consumption of dietary cholesterol is unrelated to serum cholesterol.**

52.     Through the doubly dangerous effect of both raising bad cholesterol and lowering good cholesterol levels, trans fat raises the risk of CHD more than any other known nutritive product.[35] In contrast, direct consumption of dietary cholesterol does not affect levels of serum cholesterol.[36]

53.     Six cross-sectional surveys performed involving men of all ages in

---

[33] Mozaffarian , 354 New Eng. J. Med. at 1610; *see also* High Levels of Industrially Produced Trans Fat in Popular Fast Food, 354 New Eng. J. Med. 1650, 1652 (2006).

[34] *Province Restricts Trans Fat in B.C.*, British Columbia Ministry of Healthy Living and Sport Press Release (2009), *available at* http://www2.news.gov.bc.ca/news_releases_2005-2009/2009HLS0013-000315.htm.

[35] Mozaffarian, 354 New Eng. J. Med. at 1602.

[36] Ancel Keys *et al.*, Diet and Serum Cholesterol in Man: Lack of Effect of Dietary Cholesterol, 59 J. of Nutrition 39, 51 (1956).

1    Minnesota revealed no relationship between dietary and serum cholesterol levels

2    over the normal intake range of the American diet.[37]

3         54.   Likewise, two Italian surveys showed no discrepancy in serum

4    cholesterol concentrations among men of the same age, physical activity level,

5    relative body weight, and general dietary pattern despite dramatically different

6    levels of dietary cholesterol consumption.[38]

7         55.   A 4-year study of 68 men of the same age and economic status

8    showed no variation in serum cholesterol levels despite that half maintained very

9    high-cholesterol diets and half very low-cholesterol diets.[39]

10        56.   Another study that compared 23 men before and after they doubled

11   their cholesterol intake and 41 men before and after they halved their cholesterol

12   intake found no change in serum cholesterol levels.[40]

13        57.   A study of the dietary intake of 119 Minnesota businessmen failed to

14   show any significant increase in serum cholesterol after they greatly increased their

15   consumption of dietary cholesterol. [41]

16        58.   In four other experiments, the addition or elimination of 500-600 mg

17   of cholesterol from the daily diets of the male subjects had no effect on their serum

18   cholesterol levels.[42]

19        59.   An experiment on thirteen men who were all assigned to the same 66

20   gram of fat per day diet showed no significant effect on serum cholesterol after the

21   subjects switched from 374 mg to 1369 mg of cholesterol daily. In another 12 men,

22

23   [37] Keys, 59 J. of Nutrition at 42-3.

24   [38] Keys, 59 J. of Nutrition at 49-50.
     [39] Keys, 59 J. of Nutrition at 44.

25   [40] Keys, 59 J. of Nutrition at 54.

26   [41] Keys, 59 J. of Nutrition at 44-5.
     [42] Keys, 59 J. of Nutrition at 46-8.

27

28   COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF
     UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

1    the reverse change in dietary cholesterol also exhibited no effect on serum
2    cholesterol levels. [43]

3         60.    In conclusion, the absence of any link between dietary and serum
4    cholesterol has been known to food scientists for over 50 years:

5         [I]n adult men the serum cholesterol level is essentially independent
6         of the cholesterol intake over the whole range of natural human diets.
         It is probable that infants, children and women are similar.[44]
7

8         61.    Unilever, however, markets margarines with dangerous levels of trans
9    fat as "cholesterol free" and thereby misleads consumers by implying a nonexistent
10   connection between dietary cholesterol and serum cholesterol and by insinuating
11   that consuming these margarines is useful for maintaining healthy serum
12   cholesterol levels, when in fact the consumption of Unilever's trans-fat laden
13   margarines dramatically increases serum cholesterol levels. Unilever thus deceives
14   consumers concerned about cardiovascular health into purchasing a product that in
15   fact harms their hearts.

16

17

18

19

20

21

22

23

24

25

_____

[43] Keys, 59 J. of Nutrition at 46-8.
26   [44] Keys, 59 J. of Nutrition at 54.
27

28   COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF
     UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT
     15

1  **SPECIFIC ACTS OF FRAUD, MISREPRESENTATIONS, MATERIAL**
2  **OMISSIONS, AND DECEIT**

3  **I Can't Believe It's Not Butter! Light**









62. **0g trans fat claims:** The front label of I Can't Believe It's Not Butter! Light states "0g Trans Fat per serving." The actual content of trans fat per serving is not "0g" and is omitted.

63. **Implied health claims:** Trans fat has many known harms and no health benefits. Consequently, the medical community overwhelmingly counsels against consuming any food with trans fat. Yet the product's label contains the name of the popular health and nutrition website WebMD. Unilever thereby suggests this product is (a) nutritious and (b) recommended by "MDs" when in fact there is a strong medical consensus against consuming any product containing artificial trans fat. Indeed, the webpage the label directs to is not part of the site's normal content, but a "special advertising section" created by Unilever. Additionally, Unilever packages the product with the text "For Information on Heart Healthy Diets Visit Never2Early.Org," further implying that the product is "Heart Healthy."

64. **Nutritious oils claims:** Unilever markets this product as "made with a blend of nutritious oils." One oil the product contains, however, is partially hydrogenated soybean oil, which, far from nutritious, is toxic.

65. **Misleading comparison to butter:** Unilever promotes this product by comparing the nutritional value of margarine to the nutritional value of butter using non-standard "nutritional comparison" labels that omit the products' content of trans fat. The chart compares the products' calories, fat, saturated fat, trans fat, and cholesterol.

66. However, the only reason the product has half the calories of pure butter is that it is diluted with water by approximately 50%. This is misleading for two reasons. First, trans fat is vastly more harmful than the natural saturated fat in butter. Second, the margarine product is diluted by approximately 50% but compared to undiluted butter.

67.   **Cholesterol free claims:** Unilever labels this product as "0mg cholesterol" and "naturally cholesterol free."

68.   As described in detail above, the risk of cardiovascular disease is not related to the consumption of dietary cholesterol, but to the serum levels of LDL cholesterol relative to HDL cholesterol. Unilever's margarines contain dangerous levels of trans fat, which increases LDL cholesterol and decreases HDL cholesterol levels. Unilever capitalizes on the misperception of dietary cholesterol to mislead consumers who are specifically concerned about heart health into purchasing a product that increases their bad cholesterol and raises their risk for CHD.

**I Can't Believe It's Not Butter! Original**



1

2

3

4

5

6

7

8

9

10

11

12



13

14

15

16

17

18

19

20

21

22

23

24

25

26

27



28

COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF
UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

20

1
2
3
4
5
6
7
8
9
10
11



12    69.    **0g trans fat claims:** The front label of I Can't Believe It's Not Butter!

13   Original states "0g Trans Fat per serving." The actual content of trans fat per serving is

14   not "0g" and is omitted

15    70.    **Implied health claims:** Trans fat has many known harms and no

16   health benefits. Consequently, the medical community overwhelmingly counsels

17   against consuming any food with trans fat. Yet the product's label contains the

18   name of the popular health and nutrition website WebMD. Unilever thereby

19   suggests this product is (a) nutritious and (b) recommended by "MDs" when in fact

20   there is a strong medical consensus against consuming any product containing

21   artificial trans fat. Indeed, the webpage the label directs to is not part of the site's

22   normal content, but a "special advertising section" created by Unilever.

23   Additionally, Unilever packages the product with the text "For Information on

24   Heart Healthy Diets Visit Never2Early.Org," further implying that the product is

25   "Heart Healthy."

26    71.    **Nutritious oils claims:** Unilever markets this product as "made with a

27

28   COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF
      UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

1   blend of nutritious oils." One oil the product contains, however, is partially

2   hydrogenated soybean oil, which, far from nutritious, is toxic.

3       72.   **Misleading comparison to butter:** Unilever promotes this product by

4   comparing it to butter using a non-standard "nutritional comparison" label that

5   omits the product's content of trans fat.

6       73.   Additionally, the label claims "70% less saturated fat than butter" to

7   falsely imply that it is healthier than butter despite possessing harmful amounts of

8   trans fat. This is misleading for two reasons. First, trans fat is vastly more harmful

9   than the natural saturated fat in butter. Second, the margarine product is diluted by

10  approximately 20% but compared to undiluted butter.

11      74.   **Cholesterol free claims:** Unilever labels this product as "0mg

12  cholesterol" and "naturally cholesterol free."

13      75.   As described in detail above, the risk of cardiovascular disease is not

14  related to the consumption of dietary cholesterol, but to the serum levels of LDL

15  cholesterol relative to HDL cholesterol. Unilever's margarine contains dangerous

16  levels of trans fat, which increases LDL cholesterol and decreases HDL cholesterol

17  levels. Unilever capitalizes on the misperception of dietary cholesterol to mislead

18  consumers who are specifically concerned about heart health into purchasing a

19  product that increases their bad cholesterol and raises their risk for CHD.

20

21

22

23

24

25

26

27

28

1  **I Can't Believe It's Not Butter! Cooking and Baking Sticks**



76. **0g trans fat claims:** The label of I Can't Believe It's Not Butter! Cooking and Baking Sticks states "0g Trans Fat per serving." The actual content of trans fat per serving is not "0g" and is omitted.

77. **Nutritious oils claims:** Unilever markets this product as "made with a blend of nutritious oils." One oil the product contains, however, is partially hydrogenated soybean oil, which, far from nutritious, is toxic.

78. **Misleading comparison to butter:** Unilever promotes this product by comparing the nutritional value of margarine to the nutritional value of butter using non-standard "nutritional comparison" labels that omit the products' content of trans fat. The chart compares the products' calories, fat, saturated fat, trans fat, and cholesterol.

79. Additionally, the label claims that margarine contains "50% Less Saturated Fat than Butter" to falsely imply that it is healthier than butter despite possessing harmful amounts of trans fat. This is misleading because trans fat is vastly more harmful than the natural saturated fat in butter.

80. **Cholesterol free claims:** Unilever labels this product as "0mg cholesterol" and "naturally cholesterol free."

81. As described in detail above, the risk of cardiovascular disease is not related to the consumption of dietary cholesterol, but to the serum levels of LDL cholesterol relative to HDL cholesterol. Unilever's margarines contain dangerous levels of trans fat, which increases LDL cholesterol and decreases HDL cholesterol levels. Unilever capitalizes on the misperception of dietary cholesterol to mislead consumers who are specifically concerned about heart health into purchasing a product that increases their bad cholesterol and raises their risk for CHD.

1   **<u>Shedd's Spread Country Crock</u>**

2

3

4

5

6

7

8   

9

10

11

12

13

14

15

16

17   

18

19

20

21

22

23

24   82.   **0g trans fat claims:** The label of Shedd's Spread County Crock states

25   "No Trans Fat <sub>per serving</sub>." The actual content of trans fat per serving is not "0g" and is

26   omitted.

27   83.   **Misleading comparison to butter:** Unilever promotes this product by

28

comparing the nutritional value of margarine to the nutritional value of butter using non-standard "nutritional comparison" labels that omit the products' content of trans fat. The chart compares the products' calories, fat, and cholesterol.

84.     Additionally, the label claims that margarine "contains 30% fewer calories and fat than butter" to falsely imply that it is healthier than butter despite possessing harmful amounts of trans fat. This is misleading for two reasons. First, trans fat is vastly more harmful than the natural saturated fat in butter. Second, the margarine product is diluted by approximately 30% but compared to undiluted butter.

85.     **Cholesterol free claims:** Unilever labels this product as "0mg cholesterol" and "no cholesterol."

86.     As described in detail above, the risk of cardiovascular disease is not related to the consumption of dietary cholesterol, but to the serum levels of LDL cholesterol relative to HDL cholesterol. Unilever's margarine contains dangerous levels of trans fat, which increases LDL cholesterol and decreases HDL cholesterol levels. Unilever capitalizes on the misperception of dietary cholesterol to mislead consumers who are specifically concerned about heart health into purchasing a product that increases their bad cholesterol and raises their risk for CHD.

1  **Shedd's Spread Country Crock Spreadable Sticks**

2

3

4

5

6

7

8

9

10

11

12

13

14



15

16

17

18

19

20

21

22

23

24

25

26

27



28  COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF
UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

27

87.     **Misleading comparison to butter:** Unilever promotes this product by comparing the nutritional value of margarine to the nutritional value of butter using non-standard "nutritional comparison" labels that omit the products' content of trans fat. The chart compares the products' calories, fat and cholesterol.

88.     **Cholesterol free claims:** Unilever labels this product as "0mg cholesterol", "no cholesterol," and "100% less cholesterol than butter."

89.     As described in detail above, the risk of cardiovascular disease is not related to the consumption of dietary cholesterol, but to the serum levels of LDL cholesterol relative to HDL cholesterol. Unilever's margarine contains dangerous levels of trans fat, which increases LDL cholesterol and decreases HDL cholesterol levels. Unilever capitalizes on the misperception of dietary cholesterol to mislead consumers who are specifically concerned about heart health into purchasing a product that increases their bad cholesterol and raises their risk for CHD.

1  **Brummel & Brown**





COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

29

90.    **No trans fat claims:** Brummel & Brown contains dangerous quantities of trans fat yet deceptively claims on its label to have "No Trans Fat per serving."

91.    **Misleading comparison to butter:** Unilever promotes this product by comparing the nutritional value of margarine to the nutritional value of butter using non-standard "nutritional comparison" labels that omit the products' content of trans fat. The chart compares the products' calories, fat and cholesterol.

92.    **Natural claims:** Unilever markets this product as "Natural." Brummel & Brown, however, contains partially hydrogenated soybean oil, a toxic product known to cause a range of deleterious health effects when consumed. Unilever further prominently displays the phrase "made with Natural Yogurt" in order to imply that this product is healthful ("natural") when in fact it is not.

93.    **Cholesterol free claims:** Unilever labels this product as "0mg cholesterol" and "100% less cholesterol than butter."

94.    As described in detail above, the risk of cardiovascular disease is not related to the consumption of dietary cholesterol, but to the serum levels of LDL cholesterol relative to HDL cholesterol. Unilever's margarines contain dangerous levels of trans fat, which increases LDL cholesterol and decreases HDL cholesterol levels. Unilever capitalizes on the misperception of dietary cholesterol to mislead consumers who are specifically concerned about heart health into purchasing a product that increases their bad cholesterol and raises their risk for CHD.

**Imperial Margarine**





95.  **Misleading comparison to butter:** Unilever promotes this product by comparing the nutritional value of margarine to the nutritional value of butter using non-standard "nutritional comparison" labels that omit the products' content of trans fat. The chart compares the products' calories, fat and cholesterol.

96.  **Cholesterol free claims:** Unilever labels this product as "0mg

1  cholesterol," "cholesterol free," and "100% less cholesterol than butter."

2  97.   As described in detail above, the risk of cardiovascular disease is not

3  related to the consumption of dietary cholesterol, but to the serum levels of LDL

4  cholesterol relative to HDL cholesterol. Unilever's margarines contain dangerous

5  levels of trans fat, which increases LDL cholesterol and decreases HDL cholesterol

6  levels. Unilever capitalizes on the misperception of dietary cholesterol to mislead

7  consumers who are specifically concerned about heart health into purchasing a

8  product that increases their bad cholesterol and raises their risk for CHD.

9

10  **Unilever sells other margarine products using the same deceptive practices**
11  **and labels in its other brands.**

12
                          **CLASS ACTION ALLEGATIONS**
13

14  98.   Plaintiffs bring this action on behalf of themselves and all others

15  similarly situated (the "Class") in accordance with Rule 23 of the Federal Rules of

16  Civil Procedure.

17  99.   The Class is defined as:

18  All persons (excluding officers, directors, and employees of Unilever)
    who purchased, on or after January 1, 2000, one or more Unilever
19  margarine products containing artificial trans fat for their own use
20  rather than resale or distribution.

21  100.  Questions of law and fact common to Plaintiffs and the Class include:

22        a.    Whether Unilever contributed to, committed, and/or is
23              responsible for the conduct alleged herein;

24        b.    Whether Unilever's conduct constitutes the violations of
25              law alleged herein;

26        c.    Whether Unilever acted willfully, recklessly, negligently,
              or with gross negligence in the violations of law alleged
27              herein; and

28  COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF
    UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

d.      Whether Class members are entitled to compensatory, injunctive, and other equitable relief.

82.     By purchasing and/or using these products, all Class members were subjected to the same wrongful conduct.

83.     Plaintiffs' claims are typical of the Class's claims. Plaintiffs will fairly and adequately protect the interests of the Class, have no interests that are incompatible with the interests of the Class, and have retained counsel competent and experienced in class litigation.

84.     The Class is sufficiently numerous, as it includes hundreds of thousands of individuals who purchased Unilever margarines throughout California.

85.     Class representation is superior to other options for the resolution of the controversy. The relief sought for each Class member is small. Absent the availability of class action procedures, it would be infeasible for the Class members to redress the wrongs done to them.

86.     Unilever has acted on grounds applicable to the Class, thereby making appropriate final injunctive relief or declaratory relief concerning the Class as a whole.

87.     Questions of law and fact common to the Class predominate over any questions affecting only individual members.

**Unilever fraudulently concealed the health hazards of consuming its products.**

88.     Unilever has tolled any applicable statutes of limitation by affirmatively concealing and publically misrepresenting its violations of law as described in detail above.

89.     A reasonable consumer could not have ascertained that Unilever's products contain trans fat at an earlier date through the exercise of reasonable

diligence because Unilever actively and purposefully concealed the truth regarding its products.

## FIRST CAUSE OF ACTION
### False Advertising Under the Lanham Act, 15 U.S.C. § 1125 *et seq.*

90.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

91.    Unilever has made and distributed, in interstate commerce and in this District, products that make false or misleading statements of fact regarding their content. All of the products described herein were placed into interstate commerce by Unilever and sold throughout the country and this District.

92.    These products contain on their labels actual misstatements and/or misleading statements and failures to disclose, including, among others, the statement that such products contain "no" or "0g" trans fat and are cholesterol free.

93.    These false and/or misleading statements and omissions actually deceive, or have a tendency to deceive, any reasonable consumer. This deception is material in that it is likely to influence the purchasing decision of a reasonable consumer.

94.    Plaintiffs seek an order directing Unilever to destroy all misleading and deceptive advertising materials and products in accordance with 15 U.S.C. § 1118.

95.    Plaintiffs further seek an injunction under 15 U.S.C. § 1116 restraining Unilever, its agents, employees, representatives, and all persons acting in concert with Unilever from engaging in further acts of false advertising, and ordering removal of all of Defendant's false advertisements and products possessing misleading statements or omissions of fact.

1

2

**SECOND CAUSE OF ACTION**

3

**Violations of the California Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq.* and the Common Law of Unfair Competition**

4

5      96.     Plaintiffs reallege and incorporate the allegations elsewhere in the

6    Complaint as if set forth in full herein.

7      97.     Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or

8    fraudulent business act or practice."

9      98.     The acts, omissions, misrepresentations, practices, and non-

10   disclosures of Unilever as alleged herein constitute "unlawful" business acts and

11   practices in that its conduct violates the Lanham Act, the False Advertising Law

12   and the Consumer Legal Remedies Act.

13     99.     The acts, omissions, misrepresentations, practices, and non-

14   disclosures of Unilever as alleged herein constitute "unfair" business acts and

15   practices in that its conduct is immoral, unscrupulous, and offends public policy.

16   Further, the gravity of the conduct outweighs any conceivable benefit of such

17   conduct.

18     100.    The acts, omissions, misrepresentations, practices, and non-

19   disclosures of Unilever as alleged herein constitute "fraudulent" business acts and

20   practices in that its conduct has a tendency to deceive both the Class members and

21   the general public.

22     101.    By violating the California Unfair Competition Law, Unilever also

23   violated the common law of unfair competition.

24     102.    In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an

25   order to enjoin Unilever from continuing to conduct business through unlawful,

26   unfair, and/or fraudulent acts and practices and to commence a corrective

27

28

1   advertising campaign.

2       103.   Plaintiffs further seek an order for the disgorgement and restitution of

3   all monies from the sale of these products, which were acquired through acts of

4   unlawful, unfair, and/or fraudulent competition.

5

6   **THIRD CAUSE OF ACTION**

7   **Violations of the California False Advertising Law, Bus. & Prof. Code §**
    **17500, *et seq.***

8

9       104.   Plaintiffs reallege and incorporate the allegations elsewhere in the

10   Complaint as if set forth in full herein.

11       105.   In violation of Bus. & Prof. Code § 17500 *et seq.*, the advertisements,

12   labeling, policies, acts, and practices described herein were designed to, and did,

13   result in the purchase and use of the products without the knowledge that these

14   products contained toxic artificial of trans fat.

15       106.   Unilever either knew or reasonably should have known that the labels

16   on these products were untrue and misleading.

17       107.   As a result, Plaintiffs, the Class, and the general public are entitled to

18   injunctive and equitable relief, restitution, and an order for the disgorgement of the

19   funds by which Unilever was unjustly enriched.

20

21   **FOURTH CAUSE OF ACTION**

22   **Violations of the Consumer Legal Remedies Act, Civ. Code § 1750, *et seq.***

23       108.   Plaintiffs reallege and incorporate the allegations elsewhere in the

24   Complaint as if set forth in full herein.

25       109.   The CLRA prohibits deceptive practices in connection with the

26   conduct of a business that provides goods, property, or services primarily for

27

28   COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF
    UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

personal, family, or household purposes.

110.   Unilever's policies, acts, and practices were designed to, and did, result in the purchase and use of the products primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

    a. § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have.

    b. § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another.

    c. § 1770(a)(9): advertising goods with intent not to sell them as advertised.

    d. § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

111.   As a result, Plaintiffs and the Class have suffered irreparable harm and are entitled to injunctive relief and restitution.

112.   In compliance with Civ. Code § 1782, Plaintiffs have given written notice to Unilever of their claims.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves. all others similarly situated, and the general public, pray for judgment and relief against Defendants as follows:

A.     Declaring this action to be a proper class action.

B.     An order enjoining Unilever from

    a. marketing its margarines that contain artificial trans fat as "no trans fat" and/or "0g trans fat";

    b. marketing its margarines using labels that compare undiluted butter and diluted margarine and which omit the actual content of artificial trans fat;

    c. marketing its margarines as "cholesterol free" when they contain

COMPLAINT FOR VIOLATIONS OF LANHAM ACT, UNFAIR COMPETITION LAW, COMMON LAW OF UNFAIR COMPETITION, FALSE ADVERTISING LAW, AND CONSUMER LEGAL REMEDIES ACT

37

artificial trans fat, which raises serum cholesterol'

    d.  marketing its margarines using the word "nutritious" when they contain artificial trans fat; and

    e.  marketing its margarines using the word  "natural" when they contain artificial trans fat.

C.    An order compelling Unilever to conduct a corrective advertising campaign to inform the public that its products contain unsafe amounts of trans fat at consumers' actual consumption levels.

D.    An order requiring Unilever to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice.

E.    An order compelling Unilever to destroy all misleading and deceptive advertising materials and products as provided by 15 U.S.C. § 1118.

F.    An order requiring Unilever to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of the CLRA, plus pre-and post-judgment interest thereon;

G.    Costs, expenses, and reasonable attorneys' fees;

H.    Any other and further relief the Court deems necessary, just, or proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action so triable.

1  Dated: October 29, 2009                    By,

2

3
                                             _____
4                                            THE WESTON FIRM
                                             5127 Lotus St
5                                            San Diego, CA 92107
                                             Phone: 619 255 7098
6                                            Fax: 480 247 4553

7
                                             Jared H. Beck
8                                            BECK & LEE BUSINESS TRIAL
9                                            LAWYERS
                                             28 West Flagler Street, Suite 555
10                                           Miami, FL 33130
                                             Phone: 305 789 0072
11                                           Fax: 786 664 3334

12
13                                           **Attorneys for Plaintiffs**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Margaret M. Morrow and the assigned discovery Magistrate Judge is Alicia G. Rosenberg.

The case number on all documents filed with the Court should read as follows:

## CV09- 7855 MMM (AGRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Gregory S. Weston
The Weston Firm
5127 Lotus St
San Diego, CA 92107

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Evangeline Red, Jennifer Red, and Rachel Whitt, on Behalf of Themselves and All Others Similarly Situated, | CASE NUMBER |
|---|---|
| **PLAINTIFF(S)** | cv09-7855 MMM (AGRx) |
| v. | |
| Unilever United States, Inc. and Unilever PLC, | **SUMMONS** |
| **DEFENDANT(S)** | |

TO:   DEFENDANT(S): Unilever United States, Inc. and Unilever PLC

A lawsuit has been filed against you.

Within   20   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, Gregory S. Weston , whose address is 5127 Lotus St., San Diego, CA 92107 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: 10/29/09.                          By: _____ MARILYN DAVIS _____

Deputy Clerk

(Seal of the Court)

[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Evangeline Red, Jennifer Red, and Rachel Whitt | Unilever United States, Inc. and Unilever PLC |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Gregory S. Weston, The Weston Firm. 5127 Lotus St. San Diego, CA 92107. 619 255 7098. Jared H. Beck, Beck & Lee Business Trial Associates. 28 West Flagler St, Ste 555. Miami, FL 33130. 305 789 0072 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes   ☐ No   ☑ **MONEY DEMANDED IN COMPLAINT: $** To be determined at trial

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Violations of The Lanham Act, Unfair Competition Law, Common Law of Unfair Competition, False Advertising Law, and Consumer Legal Remedies Act

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☑ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: _____ CV09 07855

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles, Los Angeles, Los Angeles | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | United Kingdom |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Y. Weston_         Date 10/27/09

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |