**THE WESTON FIRM**
GREGORY S. WESTON (239944)
888 Turquoise Street
San Diego, CA 92109
Telephone: (858) 488-1672
Facsimile: (480) 247-4553
greg@westonfirm.com

JACK FITZGERALD (257370)
2811 Sykes Court
Santa Clara, CA 95051
Telephone: (408) 459-0305
jack@westonfirm.com

*Counsel for Plaintiffs Evangeline Red,
Jennifer Red, and Rachel Whitt*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EVANGELINE RED, JENNIFER RED, RACHEL WHITT, on behalf of Themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNILEVER PLC and UNILEVER UNITED STATES, INC.,<br><br>Defendants. | Case No: 3:10-cv-00387 JW<br>Pleading Type: Class Action<br><br>**AFFIDAVIT OF ROSALYN SUTTON**<br><br>Judge: The Hon. James Ware<br>Date: September 13, 2010<br>Time: 9:00 a.m.<br>Location: Courtroom 8, 4th Floor |

**State of California**

**County of** San Diego

BEFORE ME, the undersigned Notary, Roman Cedillo, on this 26 day of August, 2010, Roz Sutton personally appeared, known to me to be a credible person and of lawful age, who being by me first duly sworn, on her oath, deposes and says,

1. I am employed as a paralegal at the Weston Firm, and have been since January 25, 2010. I graduated from San Diego State University in December, 2009. I took the LSAT on September 26, 2009 and intend to apply to law school in the fall of 2010.

2. Until June 31, 2010, I was roommates with June Higginbotham.

3. Shortly after starting at the Weston Firm, I described some of my work to Ms. Higginbotham, including cases the firm had brought concerning deceptive food labels. After noticing that Ms. Higginbotham was a frequent purchaser of some of the products the firm was investigating, I explained to her what being a representative plaintiff in a class action involved.

4. As part of that discussion, I explained that representative plaintiffs in successful class action lawsuits often receive incentive awards. I emphasized that this payment is awarded by the court, which might take several years. I never promised Ms. Higginbotham, on behalf of the Weston Firm, Gregory Weston, or anyone else, any payment or anything else of value in exchange for agreeing to be a plaintiff.

5. As a result of my conversations with her, Ms. Higginbotham retained the Weston Firm to represent her in two class actions and, due to my relationship with her, I became the Weston Firm's point of contact with Ms. Higginbotham. I have never been offered by or received from Mr. Weston, the Weston Firm, or any other person a "finder's fee," bonus, or any other payment or thing of value in exchange for referring Ms. Higginbotham.

6. On Thursday, July 29, 2010, I arrived at work in San Diego at 5:00 a.m. to file documents and attend a hearing in the District Court in Los Angeles later that morning. To avoid having them pay cab fare, I was also asked to pick up Elizabeth Lee Beck and Jared Beck from their hotel, take them to the courthouse, and return them to their hotel upon the completion of the

hearing. Due to time concerns, Ms. Beck called to inform me that she and Mr. Beck would take a cab to the courthouse, but that I would still be driving them back to their hotel after the hearing.

7. Before giving the Becks a ride on July 29, I had previously read derogatory emails Ms. Beck sent to Mr. Weston about me, heard conference calls where Ms. Beck screamed and directed obscenities at opposing counsel, and had been told by Mr. Weston of instances where Ms. Beck did the same to him. I was also aware, from hearing and participating in conversations with Mr. Weston and Mr. Fitzgerald, that the attorneys believed their venture with the Becks was problematic, and that they were considering what they might do to address those issues. Thus, by the time I was alone with the Becks on July 29, my guard was raised.

8. During the entire conversation with Ms. Beck and Mr. Beck, I was driving from the courthouse in downtown Los Angeles to the Becks' hotel near Los Angeles International Airport. Because of this, my focus was more on driving than the Becks, who I felt were talking at me. At several points I was confused by questions Ms. Beck was asking. I was also uncomfortable with the line of questioning, but did not ask Ms. Beck to stop because her volatile nature makes me uneasy.

9. Immediately upon getting into the car on the way back from the courthouse, Ms. Beck began questioning me about my salary at The Weston Firm. She said she was interested because she was considering hiring a paralegal for Beck & Lee and wanted to compare information (even though Beck & Lee already employs two paralegals). I told her that my wage was "low," but indicated that I accepted it in exchange for the learning opportunity prior to applying to law school. Because I was uncomfortable, I attempted to change the subject, for example talking about cost of living is differences in San Diego and Miami. Nevertheless, Ms. Beck continued to question me about the amount of money I made at the Weston Firm.

10. Ms. Beck also asked if I received any bonuses from Mr. Weston, such as a Christmas bonus. I told her that I was not sure, as I had not been employed at the Weston Firm during the previous Christmas, but that I was fairly certain I would receive a bonus upon the successful resolution of any cases I had done significant work on. Ms Beck asked how much I would receive, and I said that I did not know but that it was "probably" in my contract. I also told Ms. Beck that I was unsure of how bonuses were distributed. In actuality, the only agreement I

have signed with the Weston Firm is primarily a confidentiality agreement.. I have never been promised a "percentage of the settlement proceeds" by Mr. Weston or anyone else at the Weston Firm, and never told the Becks that I was.

11. At one point I joked with Ms. Beck that if the case was successful, Ms. Higginbotham might receive more money than I would. I meant that it seemed funny to me that a plaintiff could receive more money, in the form of an incentive award from the court, than I might receive from working a substantial number of hours on the case.

12. The declaration Ms. Beck submitted says I told her "Ms. Higginbotham was promised a fee 'based on a handshake.'" This is not true.

13. At more than one point in the conversation, I indicated to Ms. Beck that I had almost no knowledge of the financial dealings of the firm, and that I was not an authority on these matters.

14. On August 9, 2010, I received an email from Beck & Lee's paralegal, Alejandro Gutierrez. It said, "Roz, Can you please sent me Rebecca Yumul's contact information. Email and phone number, if available. Thank you." I have never received any other emails from Mr. Gutierrez requesting contact information for Weston Firm clients, and Mr. Gutierrez never followed-up on his August 9 email.

15. On August 25, 2010, Ms. Beck called my cell phone and left a voice mail asking me to return her call.

Rosalyn Sutton
San Diego, California

**State of California**

**County of** San Diego

Subscribed and sworn before me on this 26 day of August, 2010, by Rosalyn Sutton, proved to be on the basis of satisfactory evidence to be the person who appeared before me.

Signature:


ROMAN CEDILLO
COMM. # 1827370
NOTARY PUBLIC - CALIFORNIA
SAN DIEGO COUNTY
MY COMM. EXP. JAN. 15, 2013

3

Respectfully Submitted,

/s/ Gregory S. Weston
Gregory S. Weston

**THE WESTON FIRM**
GREGORY S. WESTON
888 Turquoise Street
San Diego, CA 92109
Telephone:   858 488 1672
Facsimile:    480 247 4553

JACK FITZGERALD
2811 Sykes Court
Santa Clara, CA 95051
Telephone: (408) 459-0305

*Counsel for Plaintiffs Evangeline Red,*
*Jennifer Red, and Rachel Whitt*