**THE WESTON FIRM**
GREGORY S. WESTON (239944)
888 Turquoise Street
San Diego, CA 92109
Telephone: (858) 488-1672
Facsimile: (480) 247-4553
greg@westonfirm.com

JACK FITZGERALD (257370)
2811 Sykes Court
Santa Clara, CA 95051
Telephone: (408) 459-0305
jack@westonfirm.com

*Counsel for Plaintiffs Evangeline Red,*
*Jennifer Red, and Rachel Whitt*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EVANGELINE RED, JENNIFER RED, RACHEL WHITT, on behalf of Themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNILEVER PLC and UNILEVER UNITED STATES, INC.,<br><br>Defendants. | Case No: 3:10-cv-00387 JW<br>Pleading Type: Class Action<br><br>**CORRECTED SUPPLEMENTAL BRIEF CONCERNING PLAINTIFFS' TERMINATION OF BECK & LEE AND REESE RICHMAN**<br><br>Judge: The Hon. James Ware<br>Date: September 13, 2010<br>Time: 9:00 a.m.<br>Location: Courtroom 8, 4th Floor |

# TABLE OF CONTENTS

TABLE OF AUTHORITES .................................................................................................. ii

STATEMENT OF ISSUES TO BE DECIDED ...................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 1

  PROCEDURAL POSTURE ............................................................................................... 2

  BACKGROUND ................................................................................................................. 3

      A. Plaintiffs Hire The Weston Firm To Bring This Class Action ............................ 3

      B. Weston Firm Personnel And Clients................................................................... 4

      C. June Higginbotham ............................................................................................ 5

      D. Beck & Lee's and Reese Richman's Involvement In *Red* .................................. 5

      E. After Problems Arise, The Weston Firm Explores Possible Solutions ............... 6

      F. Plaintiffs Terminate Beck & Lee and Reese Richman ....................................... 7

      G. The Weston Firm Brings A Declaratory Judgment Action ................................ 8

  ARGUMENT ....................................................................................................................... 8

  I.    TERMINATED COUNSEL HAVE NO STANDING TO OPPOSE TERMINATION.... 8

  II.  THE TERMINATIONS WERE FOR CAUSE............................................................ 12

      A. The Weston Firm Terminated Beck & Lee And Reese Richman Because They
         Interfered With Plaintiffs' Settlement............................................................... 12

      B. The Weston Firm Terminated Beck & Lee Because Of The Becks' Behavior . 14

      C. The Weston Firm Terminated Reese Richman Because It Demanded 50% Of
         This Case's Fee Despite Never Working On The Action................................... 20

  III. THE BECKS' ACCUSATIONS OF ETHICS VIOLATIONS ARE FALSE................. 21

      A. The Beck "Investigation" Is Not Credible ...................................................... 21

      B. The Beck's Account Of The Conversation With Ms. Sutton Is Not Credible... 24

      C. The Becks' Behavior Since Being Terminated Shows Their True Motive Is
         Retaliate And Harass....................................................................................... 26

  IV. THE ONLY RECOURSE OF THE TERMINATED FIRMS IS AGAINST THE
    WESTON FIRM IN QUANTUM MERUIT ................................................................... 29

  CONCLUSION.................................................................................................................... 31

i

*Red et al. v. Unilever PLC et al.*, Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

# **TABLE OF AUTHORITES**

## **CASES**

*Alvarado v. Fedex Corp.*, No. 04-0098, 2009 U.S. Dist. LEXIS 122581 (N.D. Cal. Dec. 18, 2009) ........................................................................................... 9

*Blank v. Borden*, 11 Cal. 3d 963 (1974) ................................................... 29

*Chambers v. Kay*, 29 Cal. 4th 142 (2002) ........................................... 10, 11

*Cohen v. Brown*, 173 Cal. App. 4th 302 (2009) ................................... 11, 29

*Doe v. Unocal Corp.*, 67 F. Supp. 2d 1140 (C.D. Cal. 1999) ..................... 30

*Fed. Sav. & Loan Ins. Corp. v. Angell, Holmes & Lea*, 838 F.2d 395 (9th Cir. 1988) ................. 8

*Fracasse v. Brent*, 6 Cal. 3d 784 (1972) ............................... 8, 10, 11, 29

*Gage v. Atwater*, 136 Cal. 170 (1902) ........................................................ 9

*Huskinson & Brown, LLP v. Wolf*, 32 Cal. 4th 453 (2004) ................... 11, 30

*In re Aesthetic Specialties, Inc.*, 37 B.R. 679 (B.A.P. 9th Cir. 1984) ........... 9

*In re Medtronic, Inc., Implantable Defibrillator Prod. Liab. Litig.*, 434 F. Supp. 2d 729 (D. Minn. 2006) ...................................................................... 28

*Jalai v. Root*, 109 Cal. App. 4th 624 (2003) ............................................ 10

*Louima v. City of New York*, No. 98 CV 5083, 2004 U.S. Dist. LEXIS 13707 (E.D.N.Y. July 21, 2004) ........................................................................ 9

*Margolin v. Shemaria*, 85 Cal. App. 4th 891 (2000) ................................ 11

*Mark v. Spencer*, 166 Cal. App. 4th 219 (2008) ...................................... 11

*Marquam v. Vachon*, 7 F.2d 607 (9th Cir. 1925) ........................................ 9

*Pac. Elec. Ry. Co. v. Campbell-Johnston*, 153 Cal. 106 (1908) ............... 11

*Pigford v. Veneman*, 215 F.R.D. 2 (D. D.C. 2003) ................................... 29

*Pippin v. Playboy Entm't Group, Inc.*, No. 02-CV-2329, 2006 U.S. Dist. LEXIS 3066 (M.D. Fla. Jan. 27, 2006) ...................................................... 9

*Plessinger v. Castleman & Haskell*, 838 F. Supp. 448 (N.D. Cal. 1993) ....... 9

ii

*Red et al. v. Unilever PLC et al.*, Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

*Rosen v. Unilever United States, Inc.*, No. 09-02563, 2010 U.S. Dist. LEXIS 43797
(N.D. Cal. May 3, 2010) ................................................. 2

*Santa Clara County Counsel Attys. Ass'n v. Woodside*, 7 Cal. 4th 525 (1994)............................ 9

*Scolinos v. Kolts*, 37 Cal. App. 4th 635 (1995).......................................................... 11

*Strong v. Beydoun*, 166 Cal. App. 4th 1398 (2008)........................................... 11, 30

*Yumul v. Smart Balance, Inc.*, No. 10-cv-927 (C.D. Cal. May 24, 2010) ...................................... 3

## STATUTES

Cal. Civ. Code § 3390(2), (5) ....................................................... 12

## STATEMENT OF ISSUES TO BE DECIDED

(1)    Whether an attorney may oppose his client's termination.

(2)    Which attorneys may act on Plaintiffs' behalves.

(3)    Whether the Becks' accusations of kickbacks and other ethical violations were fabricated in order to gain litigation advantage.

(4)    Whether the terminated attorneys' recourse is against The Weston Firm in quantum meruit.

iii

*Red et al. v. Unilever PLC et al.,* Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

Every client has the absolute right to terminate his counsel, with or without cause. Plaintiffs exercised that right when they terminated Beck & Lee and Reese Richman. In an attempt to circumvent this stone-carved rule, Beck & Lee lob ethics charges at Mr. Weston and seek to have the Court "strike" Plaintiffs' signed Notices of Termination, and "disqualify" the Weston Firm. In effect, the Becks request the Court abridge Plaintiffs' rights to choose their counsel, and force Beck & Lee's services upon them.

The Becks have filed essentially identical papers requesting they not be terminated in seven actions that were being jointly prosecuted before the Weston/Beck venture broke down. Notwithstanding their accusations, no court has assented and two California District Judges this week denied the Becks' requests and entered identical Notices of Termination. (*See* concurrently filed Declaration of Gregory S. Weston ("Weston Decl.") ¶¶ 3-5 & Exs. A-B.)

Those accusations are demonstrably false and irresponsibly made. When disregarded as they should be, what remains are Plaintiffs' unequivocal wishes that the Weston Firm alone represents them and is authorized to act on their behalves, including by completing settlement negotiations with Unilever or continuing to prosecute the case if the settlement is not approved. Beck & Lee's and Reese Richman's terminations render them non-parties in this action. If and when a settlement or judgment is finalized in this Court, terminated counsel might have claims against the Weston Firm. But those claims, and others related to the parties' agreements, are not at issue here and now.[1]

By this Memorandum, Plaintiffs: (1) demonstrate they have an absolute right to terminate their counsel and any time, even without cause; (2) provide the Court a full description of events leading up to, and reasons for, Beck & Lee's and Reese Richman's termination; (3) demonstrate

---

[1] The multiple overlapping agreements each cover several actions, including about ten pending cases and several more proposed ones. Adjudicating the parties' rights and duties separately in each action would be a waste of judicial resources and could result in inconsistent judgments. The obvious forum to resolve these issues is the action where all three firms are parties, *The Weston Firm, P.C. v. Beck & Lee P.A. and Reese Richman LLC*, a Declaratory Judgment action brought by Plaintiffs' counsel in the Southern District of California.

1

*Red et al. v. Unilever PLC et al.*, Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

the Becks' accusations of "kickbacks" and other ethics violations are false; and (4) show why any claim by terminated counsel is against the Weston Firm in quantum meruit.

## PROCEDURAL POSTURE

Plaintiffs brought this action on October 28, 2009, in the Central District of California. On January 25, 2010, Unilever's motion to stay the action was denied, but the court *sua sponte* transferred the action to this District (Dkt. No. 28) based on a first-filed action *Rosen v. Unilever United States, Inc.*, No. 5:09-cv-02563 JW, filed on June 9, 2009. This action was then reassigned to this Court pursuant to a February 18, 2010 Related Case Order. (Dkt. No. 38.) On March 1, 2010, the Court held a hearing on Unilever's motion to dismiss the *Rosen* action, which the Court on May 3, 2010 granted with prejudice. (*Rosen*, 5:09-cv-02563, Dkt. No. 57.)

The dismissed *Rosen* action asserted claims under California's UCL, FAL and CLRA for the deceptive labeling of Unilever's "I Can't Believe It's Not Butter" based on the statement that the product was "Made With A Blend of Nutritious Oils." *See Rosen v. Unilever United States, Inc.*, No. 09-02563, 2010 U.S. Dist. LEXIS 43797, at *1-3 (N.D. Cal. May 3, 2010). The Court dismissed the action with prejudice because Mr. Rosen's allegations were illogical. *Id.* at *12-14.

The *Red* Complaint is broader than Mr. Rosen's. It asserts UCL, FAL, CLRA and Lanham Act claims over seven Unilever products, including I Can't Believe It's Not Butter! Light, I Can't Believe It's Not Butter! Original, I Can't Believe It's Not Butter! Cooking & Baking, Shedd's Spread Country Crock Margarine, Shedd's Spread Country Crock Spreadable Sticks, Brummel & Brown Natural Yogurt, and Imperial Margarine. (*See* Compl. ¶¶ 62-97.) The *Red* Plaintiffs also challenge as deceptive several of these products' front-label advertisements that Mr. Rosen never mentioned or referred to, including "0g Trans Fat" and "No Trans Fat" (*id.* ¶¶ 62, 69, 76, 82, 90); references to WebMD and Never2Early.Org (*id.* ¶¶ 63, 70); misleading graphics comparing the products to butter (*id.* ¶¶ 65-66, 72-73, 78-79, 83-84, 87, 91, 95); "0mg

2

*Red et al. v. Unilever PLC et al.*, Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

cholesterol," "naturally cholesterol free," "cholesterol free,"[2] and "100% less cholesterol than butter" (*id.* ¶¶ 67-68, 74-75, 80-81, 85-86, 88-89, 93-94, 96-97); and "Natural" (*id.* ¶ 92).

Although a June 21, 2010 hearing was scheduled on Unilever's motion to dismiss this action, that day the parties advised the Court they had reached a preliminary settlement, and the Court withdrew and vacated the hearing. (Dkt. No. 68.) A preliminary approval hearing is scheduled for September 27, 2010.

## BACKGROUND

### A.    Plaintiffs Hire The Weston Firm To Bring This Class Action

Greg Weston is a graduate of Ohio State University and Harvard Law School. Since graduation nearly his entire practice has been representing plaintiffs in class action litigation in California courts. (*See* Weston Decl. ¶ 2.) After establishing his firm, Mr. Weston's first major action was against the developers and financiers of the Vue, a condominium tower in Los Angeles. Representing a class of approximately 95 pre-construction investors, Mr. Weston secured them a $1.35 million all-cash settlement. (*Id.* ¶ 6.) While the action was pending, Mr. Weston had significant contact with many members of the proposed class, who had each lost sizable investments in the building. That is how Mr. Weston met the three Plaintiffs here, Evangeline Red and her sister, Jennifer, and Rachel Whitt. (*Id.* ¶ 7.)

Mr. Weston remained in particularly good contact with Jennifer Red, frequently talking on the telephone since 2008, including about Ms. Red's other real estate investments and other class actions Mr. Weston was planning. This included discussions of possible actions challenging the false labeling of products containing trans fat. Upon hearing about Unilever's practices, which Mr. Weston considered among the worst of several companies that use trans fat, Ms. Red was eager to step forward and serve as a lead plaintiff, and also referred her sister Evangeline and her co-worker Rachel Whitt, who also knew Mr. Weston from his representation of them in

---

[2] One court recently found the term "cholesterol free" on a product containing trans fat actionable under the reasonable consumer standard. *See Yumul v. Smart Balance, Inc.*, No. 10-cv-927 (C.D. Cal. May 24, 2010) (previously lodged, *see* Dkt. No. 65, Attachment A).

the Vue class action. Plaintiffs signed retention agreements with the Weston Firm on September 30 and October 1, 2009. (*Id.* ¶ 8.) Plaintiffs have no such written agreement with Beck & Lee or Reese Richman and, indeed, have never spoken to, met, or otherwise communicated with the Becks or Mr. Reese. (*Id.* ¶ 9.)

### B.    Weston Firm Personnel And Clients

Jack Fitzgerald joined the Weston Firm in February, 2010. He graduated from Cornell University *magna cum laude*, then from New York University School of Law, where he was an editor of the New York University Law Review. Mr. Fitzgerald was previously a litigation associate at Baker & Hostetler's New York office, then moved to California where he became an associate in Mayer Brown's Palo Alto office. (*See* concurrently filed Declaration of Jack Fitzgerald ("Fitzgerald Decl.") ¶¶ 2-4.)

Davina Carson Wittick joined the Weston Firm this month. She graduated *magna cum laude* from the University of Colorado - Boulder and is a 2005 graduate of Harvard Law School. Prior to joining the firm, she was an associate at the law firms Jones Day and Faegre & Benson. She has extensive experience with class and multidistrict litigation, focusing on products liability, for example representing Eli Lily & Co. in numerous actions consolidated as *In re: Zyprexa Products Liability Litigation*, MDL No. 1596 (E.D.N.Y). (Weston Decl. ¶ 10.)

The Weston Firm currently represents nine individuals and three businesses in 11 pending actions. Seven of those twelve clients were class members in the Vue class action. Two other clients contacted Mr. Weston after hearing about another pending action in the media, and a third contacted him after reading an article he published about real estate investment law. Of the remaining two clients, one was referred to the Weston Firm by a former colleague of Jack Fitzgerald and the second by Evan Lee, a former Weston Firm paralegal. (*Id.* ¶ 11.)

The Weston Firm now has two paralegals on staff. Roz Sutton is the Weston Firm's senior paralegal. The only agreement she has ever signed with the firm is primarily a confidentiality agreement that does not mention pay in any respect. (*Id.* ¶ 12 & Ex. C.) The Weston Firm's other paralegals have all signed identical agreements (*id.* ¶ 13), none of which includes any type of provision for fee sharing or bonuses.

4

*Red et al. v. Unilever PLC et al.*, Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

### C.    June Higginbotham

June Higginbotham is a college student and volunteered to be a plaintiff in two actions against packaged food companies that use trans fat, both of which were filed and later dismissed without prejudice. Contrary to the Becks' claim that Ms. Higginbotham received "kickbacks" for acting as a plaintiff in these actions, she has never received or been offered money or anything else of value from anyone associated with the Weston Firm (aside from two meals). (*See* concurrently filed Affidavit of June Higginbotham ("Higginbotham Aff.") ¶¶ 5-6.)

Ms. Higginbotham came to volunteer for these actions because she had been sorority sisters and then roommates with Ms. Sutton. Shortly after starting with the Weston Firm, Ms. Sutton discussed the cases she was working on with Ms. Higginbotham, eventually referring her as a client. Because of Ms. Sutton's preexisting relationship with the client, she often served as the Weston Firm's point of contact with Ms. Higginbotham. (*See* Higginbotham Aff. ¶¶ 1-4; concurrently filed Affidavit of Rosalyn Sutton ("Sutton Aff.") ¶¶ 2-5.) Mr. Weston never paid or offered to pay Ms. Sutton anything for her referral. That referral occurred organically as a result of Ms. Sutton's relationship with Ms. Higginbotham and her interest in the Weston Firm's work. (Sutton Aff. ¶ 5.)

As he does with all potential clients and class action plaintiffs, Mr. Weston explained to Ms. Higginbotham, both directly and through Ms. Sutton, that representative plaintiffs are often provided incentive awards as part of a class action settlement or judgment. In doing so, Mr. Weston, as is his practice, was careful to ensure Ms. Higginbotham understood he was not promising and could not promise any particular award, or that an award will be made at all, and finally that any award was subject to court approval. (Weston Decl. ¶¶ 14-15; Higginbotham Aff. ¶ 3; Sutton Aff. ¶ 4.)

### D.    Beck & Lee's and Reese Richman's Involvement In *Red*

Mr. Weston met Mr. Beck during their first year of law school. About four months before Mr. Weston established his firm, Mr. Beck and his wife, Elizabeth Lee Beck, created the Beck & Lee law firm. (Weston Decl. ¶ 16.)

5

*Red et al. v. Unilever PLC et al.*, Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

The Becks' involvement in this case has been limited. In April 2009, Mr. Weston began the extensive research and drafting required to file this action. He spent a great deal of time and resources researching the facts and law surrounding the possible claims, reviewing the dockets of other food labeling class actions, and reading dozens of medical journal articles and studies concerning artificial trans fat, many of which are cited and described in the Complaint. He also drafted a motion for class certification at the same time as the Complaint, to better identify before filing any claims that might not be appropriate for class treatment. Finally, Mr. Weston discussed the case in detail with Plaintiffs, as well as several other potential plaintiffs, before filing in October 2009. This included, for example, extensive interviews with Plaintiffs and other potential plaintiffs about their purchases of each Unilever product. (*Id.* ¶ 17.)

During this time, Mr. Weston would occasionally send Mr. Beck updates on his work and encourage Mr. Beck to considering joining him as co-counsel. While Mr. Beck occasionally commented on Mr. Weston's drafts, this was the extent of Beck & Lee's involvement until the firms entered into the Weston-Beck JPA in March, 2010. The agreement with Reese Richman was reached around the same time. (*Id.* ¶ 18.) Even so, Ms. Beck did not even appear in the case until May 23, 2010 (Dkt. No. 63) and Mr. Reese did not appear until May 26, 2010 (Dkt. No. 64).

### E.    After Problems Arise, The Weston Firm Explores Possible Solutions

Plaintiffs terminated Beck & Lee because of their consummate unprofessional behavior, the difficulty in personally working with them, and their demand to renegotiate the parties' fee agreement once settlement in this action looked imminent. Plaintiffs terminated Reese Richman because of its assertion it is entitled to a 50% share of any fee notwithstanding that the firm has done little, if any, work on the matter, and that the agreement the 50% claim is based on is facially ineffective. But most importantly, Plaintiffs terminated both firms because the collective effect of their bickering over attorney fees was threatening to derail the settlement. *See infra* Point II(A).

The Weston Firm did not take lightly or make hastily the decision to terminate counsel. For the past several months, Mr. Weston spoke of the situation with a close lawyer friend who

6

*Red et al. v. Unilever PLC et al.,* Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

has represented plaintiffs in class actions for over a decade. (*See* concurrently filed Declaration of Courtland Creekmore.) Once Mr. Weston and Mr. Fitzgerald realized there was a clear and definitive problem that was not going away but was only increasing, they spent approximately two months discussing and pondering solutions. Initially, the Mr. Weston and Mr. Fitzgerald agreed they could let the relationship end naturally and without conflict by simply avoiding bringing any more cases together. Thus, for example, in early July, the Weston Firm declined Beck & Lee's invitation to jointly prosecute an action against Adobe. Even earlier than this, the Weston Firm dismissed without prejudice a class action brought against Kellogg over its use of trans fat, which was subject to both JPAs. (Weston Decl. ¶¶ 19-20 & Ex. D); Fitzgerald Decl. ¶ 5 & Ex. A.) But the situation worsened.

### F. Plaintiffs Terminate Beck & Lee and Reese Richman

After long deliberation and several attempts to find alternative solutions, Mr. Weston and Mr. Fitzgerald finally decided they had no other option than ending their relationship with Beck & Lee and Reese Richman. Before doing so, Mr. Weston and Mr. Fitzgerald spoke with each of their clients individually, apprising them of the situation. As a result, each client authorized the Weston Firm to terminate on their behalves Beck & Lee and Reese Richman. (Weston Decl. ¶ 21; Fitzgerald Decl. ¶ 6.) The Weston Firm did so by letters sent on August 12, 2010, requesting that those firms file Notices of Withdrawal in each of the affected cases, including this one. (*See* Weston Decl. ¶¶ 22-24 and Exs. E-F.) On August 13, 2010, Beck & Lee responded by letter, rejecting Plaintiffs' demands that they withdraw as counsel. (*Id.* ¶ 25 & Ex. G.) As a result, Plaintiffs signed and filed a Notice of Termination to advise the Court of the firing of co-counsel and seek the entrance of their termination. (Dkt. No. 70.) The Weston Firm filed similar notices in other actions affected by Beck & Lee's termination.

Of the ten actions in which Beck & Lee was terminated, only one has advanced past the pleading stage and into merits discovery, and only three (including this one) have more than 50 docket entries. (*Id.* ¶ 26.) In other words, the cases contemplated under the joint prosecution agreement are in their infancies. Similarly, of the three actions contemplated in the Reese

7

*Red et al. v. Unilever PLC et al.,* Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

Richman joint prosecution agreement, this Court has dismissed the *Rosen* action, this *Red* action is pending, and the third action against Kellogg was voluntarily dismissed.

As part of the termination, the Weston Firm requested on behalf of their clients that Beck & Lee refrain from contacting their clients directly. (*Id.* ¶¶ 23-24 & Exs. E-F.) Ignoring this request, Ms. Beck called two Weston Firm clients and left them voicemails. (*Id.* ¶¶ 27-28 & Ex. H.) Upon learning of these communications, Mr. Weston immediately sent a second letter to the Becks reminding them that these direct communications with a represented party were improper and violated professional rules. (*Id.* ¶ 29 & Ex. I.) The Becks, however, continued their attempts to directly contact Mr. Weston's clients, leaving more voicemails and sending them directly a vaguely threatening email in which Ms. Beck said she was "concerned about the adverse implications" of Beck & Lee's termination and had a "duty to advise you about any such implications." (*Id.* ¶ 30 & Ex. J.)

### G. The Weston Firm Brings A Declaratory Judgment Action

On the same day the Weston Firm terminated Beck & Lee and Reese Richman, it filed a Declaratory Judgment action against the firms in the Southern District of California to hold the agreements between the Weston Firm and Beck & Lee and Reese Richman void and unenforceable. (*Id.* ¶ 31; *see also* Complaint in *The Weston Firm, P.C. v. Beck & Lee, P.A. et al.*, No. 10 CV 1694 (S.D. Cal., filed August 12, 2010), attached to the Declaration of Jared Beck, dated August 28, 2010 (Dkt. No. 73, the "J. Beck Decl."), as Exhibit D.). That action, involving all three firms as parties, is the proper forum to decide the enforceability of the agreements, rather than to allow that dispute to disrupt ten pending actions. *See infra* Point IV.

### ARGUMENT

### I. TERMINATED COUNSEL HAVE NO STANDING TO OPPOSE TERMINATION

A client's power to discharge an attorney, with or without cause, is absolute. *Fracasse v. Brent*, 6 Cal. 3d 784, 790 (1972). *See also Fed. Sav. & Loan Ins. Corp. v. Angell, Holmes & Lea*, 838 F.2d 395, 395 (9th Cir. 1988) (California law holds "a client's power to discharge an attorney, with or without cause, 'is absolute.'" (citing *Fracasse*)); *In re Aesthetic Specialties,*

8

*Red et al. v. Unilever PLC et al.*, Case No. 3:10-cv-00387 JW
Supplemental Brief Concerning Termination of Beck & Lee and Reese Richman

*Inc.*, 37 B.R. 679, 680 (B.A.P. 9th Cir. 1984) ("It is well settled in California that a client's power to discharge his attorney, with or without cause, is absolute" (citing *Fracasse*)); *Marquam v. Vachon*, 7 F.2d 607, 607 (9th Cir. 1925) ("[T]he right of the client to dismiss the attorney, whether with or without cause and at any time, is an implied condition of the contract of employment."); *Plessinger v. Castleman & Haskell*, 838 F. Supp. 448, 450 (N.D. Cal. 1993) ("California has long recognized that a client's power to discharge an attorney, with or without cause, is absolute." (citing *Fracasse*)); *Santa Clara County Counsel Attys. Ass'n v. Woodside*, 7 Cal. 4th 525, 555 (1994) (Cal. Code Civ. P. § 284 "confer[s] upon clients . . . the "[absolute] power to discharge an attorney, with or without cause." (citing *Fracasse*; *Gage v. Atwater*, 136 Cal. 170, 172 (1902) (client "has the right to employ such attorney as will in his opinion best subserve his interest."))).

"A client has great latitude in discharging his or her attorney, and an attorney's authority to act for a client is freely revocable by the client." *Pippin v. Playboy Entm't Group, Inc.*, No. 02-CV-2329, 2006 U.S. Dist. LEXIS 3066, at *48 n.3 (M.D. Fla. Jan. 27, 2006) (finding plaintiff articulated good faith reasons for discharging attorney). "Almost any good faith reason asserted by the client may constitute cause to discharge an attorney, from conduct which causes a client to lose faith in the attorney ***to an attorney's attempts to extort a new fee agreement during intense, high-stakes settlement negotiations.***" *Id.* (emphasis added) (citations omitted). *See also Louima v. City of New York*, No. 98 CV 5083, 2004 U.S. Dist. LEXIS 13707, at *184 (E.D.N.Y. July 21, 2004) (behavior including "insults, lying, foul language, accusations of unprofessional behavior, lack of cooperation, and failure to communicate," have been found to constitute justifiable basis for an attorney to withdraw from representing a client, which requires good cause whereas a client can terminate an attorney for any reason, or none at all).

Once the Court determines a party has terminated his counsel, it has no discretion to deny that termination and force upon the party the services of terminated lawyers. *See, e.g.*, *Alvarado v. Fedex Corp.*, No. 04-0098, 2009 U.S. Dist. LEXIS 122581, at *12-13 (N.D. Cal. Dec. 18, 2009) (after clearing up "conflicting submissions" about who represented plaintiffs, Judge Illston granted Notices of Termination substantially similar to the Notice Plaintiffs filed here). Indeed,

9

*Red et al. v. Unilever PLC et al.*, Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

"[i]t should be sufficient that the client has, for whatever reason, lost faith in the attorney, to establish 'cause' for discharging him." *Fracasse*, 6 Cal. 3d at 790. Recognizing this, two other California District Judges have entered similar Notices of Termination against the Becks, ignoring their accusations made in identical declarations attached to the "Oppositions" to their termination they filed in those cases. (Weston Decl. ¶¶ 3-5 & Exs. A-B.)

Terminated counsel may argue the Weston Firm timed its firings in an attempt to secure the entire fee in this case for itself. That is not true. But regardless, the timing of the termination does not affect the analysis. *Jalai v. Root*, 109 Cal. App. 4th 624, 633 (2003) ("[A] client has the unilateral right to discharge his or her attorney with or without cause at any time—even on the courthouse steps—and the attorney only has a right to quantum meruit recovery, and only then in the event of the contingency contemplated by the contingency fee contract.")

Other courts have acknowledged similar terminations late in contingency cases. In *Chambers v. Kay*, 29 Cal. 4th 142 (2002), the plaintiff, Chambers, served as co-counsel in a sexual harassment case under an agreement with Kay, the lawyer retained by the plaintiff in that case. That agreement provided Chambers would receive a percentage of the contingent fee the client was obligated to pay Kay. Though she was notified of the arrangement, the client never gave written consent to the division of fees. Before trial, Kay dismissed Chambers from the case, while reaffirming his promise to pay Chambers one-sixth of the 40 percent contingency fee called for in the retainer agreement with the client. After securing a large verdict, Kay refused to pay Chambers. The Court held the contract unenforceable under Rule 2-200, even though the termination had come right before trial. In making that decision, the California Supreme Court said courts should not enforce a fee-splitting agreement in violation of the rule because such enforcement "would, in effect, be both countenancing and contributing to a violation of a rule we formally approved in order to 'protect the public and promote respect and confidence in the legal system." *Id.* at 158.

Here, Plaintiffs were not provided a full written disclosure of the terms of the fee division and did not give written consent as Rule 2-200 has long required. As a matter of law, that renders

the agreements unenforceable. *Chambers*, 29 Cal. 4th 142;[3] *Huskinson & Brown, LLP v. Wolf*, 32 Cal. 4th 453 (2004); *Cohen v. Brown*, 173 Cal. App. 4th 302 (2009); *Strong v. Beydoun*, 166 Cal. App. 4th 1398 (2008); *Mark v. Spencer*, 166 Cal. App. 4th 219 (2008); *Margolin*, 85 Cal. App. 4th 891; *Scolinos v. Kolts*, 37 Cal. App. 4th 635 (1995).

Beck & Lee argue the Weston Firm's position in this regard "depends on a flawed reading of a California Rule of Professional Conduct that applies to actual divisions of fees, ***not joint prosecution agreements***." (Mot. at 3, citing *Cohen*, 173 Cal. App. 4th at 320[4]). That argument is flawed because the contract is motivated by and provides for work the parties would perform and expenses they would undertake in order to earn such fees. Worse, it begs specific performance of personal services against Plaintiffs' wishes and contrary to the professional judgment of their counsel. While specific performance is unavailable under most contracts, it is doubly inappropriate here, where specific performance would mean forcing Plaintiffs to accept and pay for the services of attorneys they terminated. *See generally*, *Fracasse*, 6 Cal. 3d at 792 ("since the attorney agreed initially to take his chances on recovering any fee whatever, we believe that the fact that the success of the litigation is not longer under his control is insufficient to justify imposing a new and more onerous burden on the client").[5]

---

[3] The *Chambers* court held both parties are equally responsible for the failure to comply with Rule 2-200, and that the attorney seeking the fee "could have protected his interests, and at the same time fulfilled the beneficial purposes of the rule . . . by requesting proof of [the client's] written consent to the fee division before committing himself to her case." 29 Cal. 4th at 162-63. *See also Margolin v. Shemaria*, 85 Cal. App. 4th 891, 900 (2000) (equitable estoppel not available to overcome Rule 2-200 defense to contract action since plaintiff attorney's reliance on defendant's promise to comply with provision was not sufficiently reasonable to relief plaintiff from its requirements).

[4] In *Cohen*, the plaintiff had indicated his desire to consent to the fee division notwithstanding the dispute. The court was merely pointing out that because no fee had yet been divided, it was possible for the discharged attorney to obtain the client's consent and recover under the contract. The court did not, however, *order* the client to consent to the fee division, or force the plaintiffs to use the discharged attorney's services.

[5] *See also Pac. Elec. Ry. Co. v. Campbell-Johnston*, 153 Cal. 106, 117 (1908); Cal. Civ. Code § 3390(2), (5).

## II.    THE TERMINATIONS WERE FOR CAUSE

### A.    The Weston Firm Terminated Beck & Lee And Reese Richman Because They Interfered With Plaintiffs' Settlement

Although the parties reached a settlement in principle on June 21, one of the key elements of the term sheet was left, and remains, indefinite: how Unilever will address Plaintiffs' claims against its "stick" or "hard" margarine products. Unilever knew when the parties settled that it could replace the trans fat in its "soft" or "tub" margarines with safer but slightly more expensive alternatives as many other companies have done, but such a replacement would be much more difficult for stick margarines. (Weston Decl. ¶ 32.)

Mr. Weston and Mr. Stern went back and forth on this issue in June during settlement negotiations, and previously several months earlier during initial settlement talks. Plaintiffs' initial demand that all trans fat be removed from Unilever's stick margarines was too difficult and expensive for Defendant to agree to, especially given the procedural posture of the case. That might have even required Unilever to completely discontinue these products since there is right now no commercially acceptable substitute for artificial trans fat usable in stick margarine. Ultimately, Mr. Weston suggested this last obstacle to settlement be left for further negotiations and wrote into the final settlement term sheet four specific suggestions for Unilever to consider, which it agreed to do (*id.* ¶ 33):

> The parties agree to meet and confer to discuss methods Unilever, as indicated by its counsel, is currently undertaking to reduce its use of PHVO in its hard margarines portfolio, with the understanding that Unilever will include at least some concession relating to its hard margarine portfolio, which plaintiffs believe would be required in order that a settlement releasing hard margarine claims survive judicial and possible objector scrutiny. Such terms that Unilever agrees to consider include (1) placing the phrase "see the Nutrition Facts for other important information" below the phrase "no cholesterol" (2) agreeing to reduce the amount of trans fat per serving in Unilever's Willow Run hard margarine, which Plaintiffs' research indicates currently has 3g of trans fat per serving, to the same 1.5g trans fat per serving in Imperial hard margarine (3) agreeing to fund research in developing commercially acceptable alternatives to PHVO by certain levels (4) agreeing to modify the vegetable oil blend used in hard margarines such that the level of trans fat per serving is reduced, even if the reduction does not meet the 0.5g per serving threshold to result in label change, for instance

substituting 5% of the PHVO used in the current formulation of Imperial with the same amount of fully hydrogenated vegetable oil.

Given the already rocky relationship with the Becks and Mr. Reese, who continually made demands they receive large fees despite minimal work in this action, Mr. Weston decided to placate them, hoping to provide them with hours to bill before the final settlement by charging them with the task of negotiating a concrete and definite term concerning stick margarines. (*Id.* ¶ 34.) To Mr. Weston's dismay, the Becks and Mr. Reese ignored this task and instead immediately began arguing about attorney fees: how much each firm would get, who would receive the fee initially before distribution, and even whether the firms should, notwithstanding the Term Sheet's provision for a maximum fee of $490,000, seek a larger amount. Week after week went by with the vital task of negotiating Unilever's concession on stick margarine unaddressed. (*Id.* ¶ 35.) Even Mr. Stern noted the problem, stating in an email he would file papers with the Court "making the point that we have a settlement but have reached an impasse that ***without the appointment of a lead counsel cannot be resolved***." (*Id.* ¶ 36 & Ex. K)

Within days of the Becks and Mr. Reese's termination, however, Mr. Weston righted the situation by reviewing in detail Unilever's ignored proposal for this issue, researching the use of and amount of trans fat in Unilever's and competitors' stick margarines, and sending Unilever's counsel a long, concrete, and definite draft settlement agreement that he believed provided the most value to stick margarine purchasers without being so onerous Defendant could not accept it.[6] Mr. Weston further provided Defendant with a draft of a joint memorandum of points and authorities in support of preliminary approval of the proposed settlement. (*Id.* ¶ 37.) As Mr. Stern has said, as soon as the issue of who actually represents Plaintiffs is worked out, this settlement can quickly be completed.

---

[6] Essentially the Weston Firm's proposal on this issue is that Unilever stipulate to spend a definite amount on research and development each year for five years on reducing and removing trans fat from hard margarines, but this obligation could end early if Unilever reduced artificial trans fat by a set amount or eliminated it from these products altogether.

13

*Red et al. v. Unilever PLC et al.*, Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

## B. The Weston Firm Terminated Beck & Lee Because Of The Becks' Behavior

### 1. The Becks Engage In A Pattern Of Unprofessional Conduct

The Becks' behavior toward opposing counsel (and in some instances, co-counsel) has routinely damaged the Weston Firm's clients. That behavior frequently includes screaming, cursing, and gratuitous, ad hominem attacks. Recently, Ms. Beck came within an inch of assaulting co-counsel during a routine scheduling meeting Judge Patel ordered, and which took place in the San Francisco federal courthouse's attorney lounge.

Plaintiffs are aware of at least four sets of defense counsel that have instituted policies of memorializing conversations with Beck & Lee attorneys, presenting those parties with significant litigation advantages, to our clients' detriments. Moreover, the Weston Firm's reputation has suffered because of the Becks' behavior. One attorney advised Mr. Fitzgerald, in referring to the Becks, to be careful with whom the Weston Firm associates because one's reputation can be damaged that way. (Fitzgerald Decl. ¶¶ 14-15.) Mr. Weston and Mr. Fitzgerald were routinely embarrassed by the Becks' behavior, and often felt compelled to apologize to others for it. (Weston Decl. ¶ 38; Fitzgerald Decl. ¶ 7.) The following examples are illustrative, but not exhaustive.


February/March Interactions With Plaintiffs Attorney Ron Marron

In January 2010, a veterinarian in Long Beach, California, who was a former client of Mr. Weston's, contacted the Weston Firm, describing several unfair business practices by advertising salesmen working for the popular website Yelp.com. After several weeks of investigation, the Weston Firm wrote a complaint and determined the case would be appropriate for class action treatment. The Weston Firm filed the action in February, listing Beck & Lee as co-counsel. Soon thereafter, another class action attorney in San Diego, Ron Marron, filed a second class action suit against Yelp. Mr. Marron contacted Mr. Weston to confer on the best manner of prosecuting the two actions. Mr. Weston was receptive to Mr. Marron's offer to join forces, but the Becks strongly disagreed, repeatedly disparaged Mr. Marron, and began behaving erratically in order to drive him away (which succeeded). (Weston Decl. ¶¶ 39-40.)

14

According to Mr. Marron, ***"[t]he Becks are among the most unprofessional attorneys I have ever dealt with.*** They accused me of cooperating with the Defendant, made angry demands that I immediately dismiss my case, and their telephone calls with me involved them screaming and using profanities. I was so shocked by this behavior I made a contemporaneous record of it with the intention of bringing it to the attention of Judge Fairbank." (*See* concurrently filed Declaration of Ron Marron, ¶ 6 (emphasis added).) Ultimately, Mr. Marron decided the Becks' behavior made working on the case not worth his time and energy. As a result, he set up a lunch meeting with Mr. Weston and his client, another small business owner, and ultimately referred the client to the Weston Firm. (*See id.* ¶ 7.)

May 11, 2010 Telephone Call With Defense Counsel Dean Panos

On May 11, 2010, Dean Panos, who is lead counsel for Kraft Foods in an action challenging Kraft's food labeling of products containing artificial trans fat, called Mr. Weston. Mr. Panos reported to Mr. Weston that Ms. Beck had just initiated a call with him and immediately began cursing and screaming at him. Mr. Panos was initially so surprised he thought Ms. Beck had called the wrong person, and asked her, as she was screaming, if she knew who she was talking to. This further angered Ms. Beck, who continued cursing and screaming at Mr. Panos. Mr. Panos shortly began typing a "best effort" word-for-word record of the call, and informed Mr. Weston that he would submit it to the court and seek sanctions against Plaintiffs if Ms. Beck had any further contact with him or other Jenner & Block attorneys. Mr. Weston then notified the Becks of this call, and Ms. Beck denied cursing at Mr. Panos while noting he had "paper-thin skin." (Weston Decl. ¶ 41.)

[section removed in corrected brief]

15

*Red et al. v. Unilever PLC et al.,* Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

1

2

3

4                              [section removed in corrected brief]

5

6

7

8

9    <u>July 19, 2010 Case Management Conference</u>

10          On July 19, the Weston Firm and Beck & Lee appeared before Judge Patel for a case

11   management conference in the same Yelp! class action in which the Becks had driven off Mr.

12   Marron. After Judge Patel ordered the case consolidated with a second later-filed action, she

13   ordered the respective plaintiffs' counsel to meet and confer with defendant's counsel in the

14   courthouse's attorney lounge, to determine a schedule for filing a consolidated complaint and

15   beginning discovery. (Fitzgerald Decl. ¶ 8.) What ensued David Ongaro, plaintiff's counsel in

16   the later-filed action, described as ***"a scene I have never seen in 19 years of practicing law."***

17   Defense counsel Matthew D. Brown confirmed, ***"I have not had a conference quite like the one***

18   ***I experienced, in my years of practice here either."***

19          Ms. Beck had previously butted heads with the Mr. Ongaro, when she requested he

20   stipulate to our appointment as lead counsel and he in turn requested certain information relating

21   to our qualifications. (Fitzgerald Decl. ¶ 9 & Ex. B). Ms. Beck apparently took this as a personal

22   insult, because as soon as she entered the attorneys lounge and sat diagonally across the table

23   from Mr. Ongaro, she began screaming and swearing. Ms. Beck accused Mr. Ongaro of being in

24   "cahoots" with Yelp, of being a sell-out (because he is primarily a defense lawyer who does

25   some plaintiff work), and of being a failed partner at his previous firm. Several times during her

26   fit, Ms. Beck lunged across the table at Mr. Ongaro, repeatedly thrusting in his face her one

27   finger extended from an otherwise tightly-clenched fist, coming within an inch or two of striking

28   him. (*Id.* ¶ 10.)

16

*Red et al. v. Unilever PLC et al.,* Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

As this was happening, Mr. Fitzgerald implored Mr. Beck to intervene and regain control of Ms. Beck. Mr. Beck stated that this "had to happen" and instructed Mr. Fitzgerald not to intervene. (*Id.* ¶ 11.) Eventually Ms. Beck became calm and retook her seat. As counsel proceeded through each item, however, she again became hostile, and again shouted at and insulted Mr. Ongaro, and lunged across the table at him. During this time, Mr. Beck attempted to hold Ms. Beck back while stating that they had tried "cleared the air" but accusing Mr. Ongaro of further provoking Ms. Beck. (*Id.* ¶ 12.)

After a few minutes, Mr. Ongaro and defense counsel ended the conference over the Becks' objections, electing to return to Judge Patel and advise her what had happened.

**MR. ONGARO:** Well, Your Honor, what actually happened was, when we went to sit down, Ms. Beck Lee became agitated, was screaming at me, pointing her finger at me. Literally, her finger was this close (indicating). I asked her to please sit down and stop pointing her finger. It was a scene I have never seen in 19 years of practicing law.

We then got her calmed down, to sit down. We then started to go through—and we had previously, in the scheduling order that we had put together, as the Court's ordered with the Cooley attorneys, had sat down and kind of scoped out what we planned for discovery.

The first thing they disagreed with. Again, they yelled at me, saying I'm in cahoots with them and I shouldn't be on this case. Every single item we went to became very contentious. And I just—it was counter—let me finish. It was counterproductive.

And I think—we've already sat down and figured out kind of how we think it should go. Happy to sit down with them. But Ms. Beck Lee, it's difficult to work with her under these circumstances.

And Mr. Brown can certainly attest to what happened. He's the neutral party here.

**MR. BROWN:** Far be it from me to be in the position of umpire here, but I have not had a conference quite like the one I experienced, in my years of practice here either. It was not productive.

(*Id.* ¶ 13 & Ex. C.)

In addition to Mr. Fitzgerald, Mr. Beck and Ms. Beck, there were four witnesses to this conference: David Ongaro and Amelia Winchester, of Ongaro Burtt, and Matthew D. Brown and Benjamin H. Klein, of Cooley Godward. Mr. Fitzgerald observed at least Ms. Winchester and Mr. Klein taking contemporaneous hand-written notes as the episode occurred. (*Id.* ¶ 14.)

July 6, 2010 "Meet & Confer" Conference Call With Defense Counsel Dale Giali

On July 6, 2010, Mr. Fitzgerald began a meet-and-confer call with Dale Giali of Howrey, counsel for defendant Nestle in another action, and Ms. Beck joined late. When Mr. Giali stated he thought one claim would not survive a motion to dismiss and should be voluntarily dismissed, Ms. Beck became agitated, eventually yelling at counsel and instructing him not to "tell her what to do." Defense counsel commented that Ms. Beck had taken what was proceeding as a very professional and productive meet and confer, and turned it into "something else." (Fitzgerald Decl. ¶ 16.)

### 2. The Becks Treat Mr. Weston And Mr. Fitzgerald Poorly

Although the Weston Firm and Beck & Lee sometimes worked together productively, the relationship became increasingly acrimonious before it finally broke down altogether. At times this included the Becks screaming and swearing at Mr. Weston and Mr. Fitzgerald, as well as calling up each individually and disparaging the other. The Becks also lectured Weston Firm attorneys, and demanded various "rules" for the relationship. The Becks insisted, for example, that they review and approve every decision, communication or filing made by the Weston Firm, although they did not extend the same courtesy to the Weston Firm attorneys. (Weston Decl. ¶ 43.) On one occasion, after learning of a mistake in a document served in another action, Ms. Beck called Mr. Fitzgerald to tell him that Jared was "very upset" with him and "doesn't know if he can work with you any longer." Ms. Beck berated Mr. Fitzgerald, asking if he was on drugs, if

18

he was stupid or, if not, what his problem was. (Fitzgerald Decl. ¶ 34.) In sum, the Weston Firm's involvement with the Becks was marked by frequent and uncomfortable personal conflict.

3.    <u>The Becks Demand A Larger Portion Of This Case's Settlement</u>

When they executed the joint prosecution agreement in March, ***the Becks acknowledged "The Weston firm has at present in several of the Actions billed a large majority of the hours*** . . . ." (*See* Weston-Beck joint prosecution agreement ¶ 10, attached to the J. Beck Decl. as Exhibit B (hereinafter "Weston-Beck JPA") (emphasis added).) The agreement contemplated that, as the cases progressed, the firms would each aim to "do roughly fifty percent (50%) of the work . . . ." (*Id.* ¶ 4.)  This case, however, preliminarily settled just three months later, and so the Weston Firm's "large majority of hours" remained.

The agreement also provides that the fee division "will be allocated according to a pro rata share of the work done by each Party as compared to the work done on a lawsuit in total." (*Id.*) Nevertheless, in a show of good faith and anticipation that Beck & Lee would "catch up" on hours, Mr. Weston agreed that, in any event, Beck & Lee would be entitled to a minimum one-third portion of any fee due to the Weston Firm even if they billed less than that amount. Although Beck & Lee's hours on this action were substantially lower than the Weston Firm's, the firm was prepared to honor that agreement. (Weston Decl. ¶ 44; *see also* Weston-Beck JPA ¶ 10.) That, however, was not enough for the Becks.

On Saturday, June 19, the Weston Firm and Beck & Lee were concurrently preparing for the hearing on Unilever's Motion to Dismiss scheduled for June 21, and negotiating a settlement with Unilever. All four attorneys spoke that afternoon by conference call. On that call, Ms. Beck stated her position that the Becks were entitled to more than the one-third minimum provided for under the joint prosecution agreement. That call quickly degraded into a shouting match and, later, a flurry of angry emails from Ms. Beck. (Weston Decl. ¶¶ 45-52 & Exs. M-S.) The parties eventually cooled off and agreed that, because there was a dispute as to each party's entitlement to any settlement fee, the parties would require Unilever, as a term of the settlement, to transfer any attorneys fees to a Weston Firm account established and controlled by Mr. Fitzgerald,

*Red et al. v. Unilever PLC et al.,* Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

because he was thought to be the most "neutral" party. The parties agreed they would try to work out the division later. (*Id.* ¶ 53.)

4.    The Becks Authorize A Settlement Distribution In Their Favor, Without The Weston Firm's Permission Or Approval

As noted, from late June through early August, the Becks and Mr. Reese disputed amongst themselves how any fee should be divided, including in emails, sometimes with Unilever's counsel, William Stern. The situation quickly came to a stand-still, and little progress was being made, calling into question whether the resolution the Weston Firm's clients and Unilever had bargained for would really happen. (*Id.* ¶ 54.)

On August 11, 2010, Mr. Stern emailed all counsel, noting that Reese Richman had rejected "the suggestion that the atty fees be escrowed 1/3 each at your three law firms." (*Id.* ¶ 36 & Ex. K.) The Becks never previously discussed that "suggestion" with the Weston Firm, and the Weston Firm never authorized it. (*Id.* ¶ 55.) If carried out, it would effectively give the Becks fees far exceeding their share under the JPA. The Weston Firm considered this unauthorized approval for the distribution of settlement fees a serious breach of the agreement and good faith, and was the proverbial "straw" upon which Beck & Lee's termination the following day was finally predicated. (*Id.*)

C.    **The Weston Firm Terminated Reese Richman Because It Demanded 50% Of This Case's Fee Despite Never Working On The Action**

Aside from attending a joint and unsuccessful *Red* and *Rosen* mediation, Reese Richman has not contributed to the *Red* case. (*Id.* ¶ 56.) Shortly after agreeing to work on the cases together, Mr. Reese's case was dismissed with prejudice. A few weeks later, the *Red* plaintiffs had reached a tentative settlement with Unilever. Mr. Reese at the time was on vacation in Morocco and had no part in the negotiations. Thus, there was simply no opportunity for Reese Richman to contribute to the action.

Notwithstanding the firm's absence from the action, since learning of the impending settlement, Reese Richman has repeatedly demanded 50% of any attorneys fees based on the JPA. (*Id.* & Ex. T.) The agreement provides, however, that the parties "will each undertake

20

substantive work sufficient to justify" the contemplated 50% division. (*See* Weston-Beck-Reese joint prosecution agreement, attached to the J. Beck Decl. as Exhibit A (hereinafter the "Weston-Beck-Reese JPA") ¶ 3.) That has not happened.

The Weston-Beck-Reese JPA further provides "***This Agreement and its effectiveness is expressly contingent on the Parties' respective client's approval of this Agreement***." (*Id.* ¶ 7 (emphasis added).) Because neither the Weston Firm's nor Reese Richman's clients approved the agreement, it is facially inapplicable, ineffective and unenforceable. And even if that provision had not been in the agreement, it would still be void and unenforceable under California Rule of Professional Conduct 2-200.

## III.  THE BECKS' ACCUSATIONS OF ETHICS VIOLATIONS ARE FALSE

The Weston Firm and its attorneys have never given, or offered, any person money or anything else of value in exchange for being a plaintiff. Nor has the Weston Firm ever employed a "capper" or "runner," or paid or promised any person any money or anything else of value, in exchange for locating or referring a client or plaintiff. (Weston Decl. ¶ 57.) And, the Weston Firm has never paid or promised to pay non-attorney employees bonuses as a percentage of a recovery. (*Id.* ¶ 58.)

The Becks nevertheless accuse Mr. Weston of engaging in all this illegal and unethical behavior on the basis of a conversation they testify they had with Weston Firm paralegal Roz Sutton. California Rule of Professional Conduct 5-100 states: "A member shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute." That is exactly what the Becks have done in retaliation for their firing.

### A.  The Beck "Investigation" Is Not Credible

#### 1.  The Becks Have Filed No Contemporaneous Record Of An Investigation

Although allegedly begun on July 29, the first record of an "investigation" was in Mr. Beck's August 13 letter, the day after Beck & Lee was terminated. (*See id.* ¶ 25 & Ex. G.) Although the Becks have filed 19 docket entries relating to their termination in 10 cases (several of which included lengthy declarations and exhibits), they have never produced a contemporaneous record of the investigation, even though Ms. Beck's and Mr. Gutierrez's

21

declarations allege such records were created.[7] (*See* Declaration of Elizabeth Lee Beck, dated August 18, 2010 (Dkt. No. 72, the "E. Beck Decl.") ¶ 11; Declaration of Alejandro Gutierrez, dated August 17, 2010 (Dkt. No. 74, the "Gutierrez Decl.") ¶¶ 4-5.)

### 2. The Becks' Investigation Story Is Inconsistent And Contradictory

According to the Becks, after learning of serious criminal and ethical violations during a July 29 conversation with Ms. Sutton, they felt it was their "obligation" (E. Beck Decl. ¶ 10) and they were "duty-bound" (J. Beck Decl. ¶ 16) to investigate the Weston Firm. They agreed the first step was to obtain the contact information of the ten Weston Firm clients who were plaintiffs in actions being jointly prosecuted. (E. Beck Decl. ¶ 10; J. Beck Decl. ¶ 16.) The next day Ms. Beck directed paralegal Alejandro Gutierrez to draft separate emails to the Weston Firm requesting the contact information of each of the ten plaintiffs, which he placed in Ms. Beck's inbox for her review that same day. (E. Beck. Decl. ¶ 11.)

Despite the urgency and seriousness of the situation, the Becks did not review Mr. Gutierrez's July 30 drafts until 11 days later, on August 9, when they finally instructed Mr. Gutierrez to send just one of the emails to the Weston Firm. (E. Beck Decl. ¶ 13.) That one-line email reads, "Can you please send me Rebecca Yumul's contact information. Email and phone number, if available." (Weston Decl.¶ 59 & Ex. U.) Although the Becks claim they could not have reviewed the ten identical one-line emails earlier because they were in Clearwater from August 1 to 6 (E. Beck Decl. ¶ 12-13; J. Beck Decl. ¶ 18), during that time the Becks:

- Reviewed a draft First Amended Complaint in another case, and provided edits (*see* Fitzgerald Decl. ¶ 17 & Ex. D);
- Reviewed an Opposition to a motion to strike in another case, which the Weston Firm drafted (*see id.* ¶ 18 & Ex. E), then provided "significant edits" to the Opposition, and circulated revisions in a new Word document (*see id.* ¶¶ 19-20 & Exs. F-G);

---

[7] The Becks attached several exhibits to Jared Beck's Declaration, but none concerning the purported investigation. Any such "records" submitted now would be of dubious authenticity.

22

*Red et al. v. Unilever PLC et al.*, Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

- Reviewed a Response to a request for judicial notice filed by a party in another case (*see id.* ¶ 21 & Exs. H), which the Weston Firm drafted, then provided revisions to that Response, circulated in a new Word document (*see id.* ¶ 22 & Exs. I);

- Reviewed a brief submitted by opposing counsel over ECF system, which cannot be downloaded on a mobile device (*see id.* ¶ 23 & Ex. J);

- Set up a meet and confer conference with opposing counsel in another case (*see id.* ¶ 24 & Ex. K); and

- Communicated with opposing counsel concerning outstanding discovery requests (*see id.* ¶ 25 & Ex. L).

### 3. Mr. Gutierrez's Single Email Contradicts The Becks' Investigation Story

The Becks claim they instructed Mr. Gutierrez to obtain mailing addresses for Weston Firm clients, and that he drafted emails to that effect (E. Beck Decl. ¶ 11; Gutierrez Decl. ¶ 4), but the email he sent Ms. Sutton requests only Rebecca Yumul's email and phone number, not her address. (Weston Decl. ¶ 59 & Ex. U.)

The Becks also offer no explanation for why they instructed Mr. Gutierrez to draft ten emails but later directed him to send only one, or why neither he nor anyone else ever sent the remaining nine emails, even though there were three days between Mr. Gutierrez's August 9 email and Beck & Lee's August 12 termination. And, if the Becks were going to obtain the contact information of a single Weston Firm client, it makes no sense that they would ask for Rebecca Yumul's information, when Ms. Sutton had supposedly told them Mr. Weston promised June Higginbotham a "kickback." Any real investigation would have logically begun with Ms. Higginbotham.

Finally, the simplicity of Mr. Gutierrez's email and the typographical errors in it (no question mark, sentence fragment) suggest (a) that attorney review was not necessary before sending, but any "review" could have been completed within seconds; and (b) the email was

23

*Red et al. v. Unilever PLC et al.*, Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

probably never actually reviewed, but instead first drafted and sent on August 9 for another reason, not as a step in furtherance of an investigation.[8]

### 4. The Becks' Behavior Between July 29 and August 12 Contradicts Their Investigation Story

The Becks' behavior viz-a-viz the Weston Firm between July 29 and their August 12 termination further belies their story of an investigation. Far from distancing themselves from the Weston Firm after the July 29 conversation, which would be expected and appropriate if the Becks had really learned of crimes and ethics violations, they pushed and promoted the relationship through the time they were terminated. For example, the Becks:

- Discussed strategy on how to amend an action they were jointly prosecuting with the Weston Firm (*see* Fitzgerald Decl. ¶ 26 & Ex. M);

- Discussed strategy on responding to an Order to Show Cause, including how the issue raised affects other cases the firms were jointly prosecuting (*see id.* ¶ 27 & Ex. N);

- Circulated a draft Notice of Deposition for review (*see id.* ¶ 28 & Ex. O);

- Communicated with Reese Richman about the settlement in this case, aligning themselves with the Weston Firm (*see id.* ¶ 29 & Ex. P);

- Discussed the division of labor on a case being jointly prosecuted with the Weston Firm (*see id.* ¶ 30 & Ex. Q); and

- Sent an email attaching a draft First Amended Complaint, which "We should try to file this week" (*see id.* ¶ 31 & Ex. R), then repeatedly prodded the Weston Firm to file the amended complaint (*see id.* ¶¶ 33-33 & Exs. S-T).

### B. The Becks' Account Of The Conversation With Ms. Sutton Is Not Credible

The credibility of the Becks' account of their conversation with Ms. Sutton is no greater than that of the investigation it supposedly prompted. A month before the July 29 conversation, Ms. Sutton had read derogatory emails that Ms. Beck had sent to Mr. Weston about Ms. Sutton,

---

[8] Discovery has commenced in that action, and defense counsel had indicated it would soon like to take Ms. Yumul's deposition, then served a deposition notice. At the time, the Becks were handling that particular task, and thus may have been seeking Ms. Yumul's information for that reason.

and knew of the growing problem in the venture. (Sutton Aff. ¶ 7; *see* Weston Decl. ¶¶ 48-49 & Ex. O-P.) In addition, Ms. Beck's volatile nature makes Ms. Sutton uneasy. (*Id.* ¶ 8.) Thus, when Ms. Sutton was alone in a car with the Becks, she already had her guard up. (*Id.* ¶ 7.)

According to the Becks, while she navigated Los Angeles traffic from the federal courthouse downtown to LAX, Ms. Sutton nevertheless confessed she was the conduit for and recipient of illegal plaintiff kickbacks. That defies reason.

Ms. Sutton's account of the conversation is much different. Ms. Sutton testifies that immediately upon getting into the car on the way back from the courthouse, Ms. Beck began questioning her about her salary at The Weston Firm. Ms. Beck said she was interested because she was considering hiring a paralegal for Beck & Lee and wanted to compare information. Ms. Sutton told Ms. Beck that her wage was "low," but indicated that she accepted the low wage it in exchange for the learning opportunity prior to applying to law school. Because she was uncomfortable, Ms. Sutton attempted to change the subject, for example talking about cost of living is differences in San Diego and Miami. Nevertheless, Ms. Beck continued to question Ms. Sutton about the amount of money she made at the Weston Firm. (Sutton Aff. ¶ 9.)

Ms. Beck also asked if Ms. Sutton received any bonuses from Mr. Weston, such as a Christmas bonus. Ms. Sutton told Ms. Beck she was not sure, as she had not been employed at the Weston Firm during the previous Christmas, but that she was fairly certain she would receive a bonus upon the successful resolution of any cases she had done significant work on. Ms Beck asked how much Ms. Sutton would receive, and Ms. Sutton said she did not know but that it was "probably" in her contract. Ms. Sutton also told Ms. Beck that she was unsure of how bonuses were distributed. In actuality, the only agreement Ms. Sutton has signed with the Weston Firm is primarily a confidentiality agreement. (*See* Weston Decl. ¶ 12 & Ex. C.) Ms. Sutton has never been promised a "percentage of the settlement proceeds" by Mr. Weston or anyone else at the Weston Firm, and never told the Becks that she was. (Sutton Aff. ¶ 10.)

At one point during the conversation, Ms. Sutton joked with Ms. Beck that if the case was successful, Ms. Higginbotham might receive more money than she would. Ms. Sutton meant that it seemed funny to her that a plaintiff could receive more money, in the form of an incentive

award from the court, than she might receive from working a substantial number of hours on the case. (*Id.* ¶ 11.)

Elizabeth Beck's declaration says Ms. Sutton told Ms. Beck "Ms. Higginbotham was promised [a] fee by Mr. Weston 'based on a handshake.'" (E. Beck Decl. ¶ 9.) Ms. Sutton categorically denies that. (Sutton Aff. ¶ 12.) Moreover, at more than one point during the conversation, Ms. Sutton told Ms. Beck she has almost no knowledge of the firm's finances, and that she was not an authority on these matters. (*Id.* ¶ 13.)

## C. The Becks' Behavior Since Being Terminated Shows Their True Motive Is To Retaliate And Harass

The Becks first levied accusations of misconduct at the Weston Firm on August 17, in papers filed in the matter of *Yumul v. Smart Balance, Inc.*, No. 10-cv-927 (C.D. Cal.) (*see* Dkt. Nos. 32-35). Within hours, the Becks had distributed electronic copies of those filings to more than 25 Weston Firm co-counsel and defense counsel in other cases. (Weston Decl. ¶¶ 60-66 & Exs. V-BB.) The next day, the Becks repeated their accusations to a writer for the Los Angeles Daily Journal, which published an article on August 19 titled "Attorney Accused Of Kickbacks." (Weston Decl. ¶¶ 67-68 & Ex. CC-DD.)

The Becks have also begun harassing current and former Weston Firm personnel. Two days before this brief was due, Ms. Beck called Ms. Sutton's cell phone, leaving a voice mail asking for a return call. (Sutton Aff. ¶ 15.) And, the Becks have served former Weston Firm paralegal Evan Lee with *two* deposition subpoenas, giving Mr. Lee one week's notice, and suggesting a deposition be taken in Mr. Lee's law school dorm. (*See* concurrently filed Affidavit of Evan Lee ("Lee Aff.") ¶¶ 13, 18 & Ex. A.) Ms. Beck has also apparently obtained his class schedule. (*Id.* ¶ 14.)

The Becks' behavior toward Mr. Lee—including threatening his law school and professional career—is particularly harassing, and telling. This Wednesday, August 25, Mr. Lee began receiving several phone calls from an unknown number. When he finally answered, Mr. Lee discovered a process server was attempting to serve him with a subpoena. (*Id.* ¶ 2.) The next day, Mr. Lee received a phone call at 8:57 a.m. from Ms. Beck, who left a message asking for a

26

return call. (*Id.* ¶ 3.) Mr. Lee returned her call at 4:59 p.m. on August 26, and spoke with Ms. Beck for 14 minutes. (*Id.* ¶ 4.)

During that call, Ms. Beck asked Mr. Lee why he was avoiding the subpoena. (*Id.* ¶ 5.) She described to Mr. Lee her version of the conversation with Ms. Sutton. (*Id.* ¶ 7.) She also told Mr. Lee that Mr. Weston had "canned" Ms. Sutton "because of the fact that she told the truth." (*Id.* ¶ 8.) That is false (Sutton Aff. ¶ 1; Weston Decl. ¶ 12), and Ms. Beck could have no reasonable basis for thinking otherwise.

When asked what Mr. Lee thought of Ms. Beck's allegations, Mr. Lee responded, "To be honest, I think Roz either misinterpreted or misconstrued or misspoke, because I haven't heard about any of that, and I never received any such bonus, so I really have no idea." (Lee Aff. ¶ 9.) Ms. Beck then began to threaten and intimidate Mr. Lee. She told him that he is "shielded from liability because he's not an attorney who should know better," but said that "justice has a long reach" and that if Mr. Lee "perjured himself" there would be serious ramifications. Ms. Beck further stated she is "vigilant," "relentless," and "will get to the bottom of this" no matter how far she has to go. (*Id.* ¶ 11.).

Mr. Lee explained to Ms. Beck that no such agreements were ever made to his knowledge, and if deposed he would only tell the truth. Ms. Beck responded by stating that she sure hoped so because being found to have committed perjury could have serious consequences for his law school and legal career. Mr. Lee stated he was not worried about that because integrity is not an empty word to him, and he is telling the truth. (*See id.* ¶ 12.)

But it was one remark Ms. Beck made during the conversation which is particularly telling: After describing to Mr. Lee how diligent and vigilant she has been in her search for proof of her accusations, Ms. Beck stated, "I will NOT be disbarred." (*Id.* ¶ 17.)

         \*      \*      \*

Although the Becks claim their **August 12** termination came "without any prior explanation or notice" (J. Beck Decl. ¶ 19), Ms. Beck's **June 19** email reacting to Mr. Weston's warning that he would fire them and arbitrate the agreement, shows otherwise:

1    "You want to throw me away? After I have put up the Beck Firm's hard,

2    hard earned money and done work on this, you freaking want to chuck me!?!"

3  (*See* Weston Decl. ¶ 47 & Ex. N.) Or, more to the point:

4    "You want to arbitrate this fee fight you said? You want to take this to the

5    courts/arb and terminate our working relationship over a crummy first settlement?

6    Is the Unilever settlement that important to you? Because it's not to me, in the

7    grand scheme of things. But I don't get screwed over, as a matter of principle.

8    Even if it's over a nickel. You should look at the Beck & Lee Law Firm v. the law

9    firm of will wright, the last lawyer who saw Jared and me as stupids who will

10    work hard for nothing. Screw u, greg Weston. My mother did not raise a fool.

11    You want to take this to court, irretreviably damage any relationship we

12    ever had, go ahead and do it. You may win a few extra coins, you may not. You

13    may even lose some. You look at your little pile of coins and coo at them while

14    jared and I will move on to other things."

15  (*See* Weston Decl. ¶ 46 & Ex. M.)

16    Plaintiffs have provided extensive, detailed, contemporaneous records of the facts and

17  reasons giving rise to Beck & Lee's termination, including third-party accounts and documentary

18  proof. The Becks' accusations of misconduct, by contrast, which they claim is the basis of their

19  termination, are based on otherwise unsupported "proof" they themselves provide, and which is

20  contradicted by the sworn statements of the witnesses involved.[9]

21    The circumstantial evidence casts an equally large shadow of doubt over the Becks'

22  claims. They instructed Mr. Gutierrez to send emails, but he never sent them, and they acted

23  without the urgency they said they felt following the conversation with Ms. Sutton. After the

24

25  [9] Unilever argues the Court could remove counsel for even the "[a]ppearance of wrongdoing"
    (Br. at 7) based on the Becks' claims. But in *In re Medtronic, Inc., Implantable Defibrillator*

26  *Prod. Liab. Litig.*, 434 F. Supp. 2d 729, 731 (D. Minn. 2006), the court removed an attorney
    from the Plaintiffs Steering Committee in a complex securities action, *after his entire firm had*

27  *been indicted*. To remove the Weston Firm as class counsel now, based solely on the accusations
    of terminated counsel and before the Court has made any factual findings, would be grossly

28  unfair.

Becks had supposedly initiated an investigation, they never behaved as if they had really learned of illegal kickbacks and other ethics violations on July 29. And, since first filing their accusations on August 17, the Becks have been searching for proof supporting their claims, and now worry about the consequences when the Court inevitably discovers the Becks' accusations are fabricated.

In sum, the evidence suggests the Becks make their accusations in a misguided attempt to retain control over cases in which they have been terminated. Because of that, the filings should be stricken. *See Pigford v. Veneman*, 215 F.R.D. 2, 7 (D. D.C. 2003) (filings "unsupported by facts or evidence, [which] constitute a form of harassment, and are scandalous" should be stricken).

## IV.   THE ONLY RECOURSE OF THE TERMINATED FIRMS IS AGAINST THE WESTON FIRM IN QUANTUM MERUIT

This action was brought on contingency. "[A]n attorney, retained under a valid contingent fee contract, upon discharge by his client with or without cause before the happening of the contingency, is not entitled to recover the full amount provided by the contract but only the reasonable value of his services rendered to the time of the discharge." *Blank v. Borden*, 11 Cal. 3d 963, 973 (1974); *see also Alvarado*, 2009 U.S. Dist. LXIS 122581, at *5 (finding that "Ms. Parker had contingency fee agreements with the settlement plaintiffs, and that when plaintiffs fired her in March 2006, the contingency had not yet occurred; thus Ms. Parker's recovery is limited under *quantum meruit* to the reasonable value of her services rendered up to the time of discharge."); *Fracasse*, 6 Cal. 3d at 791-92 ("[T]he cause of action to recover compensation under a contingency fee contract does not accrue until the occurrence of the stated contingency.").

A discharged attorney's claim is "in quantum meruit . . . [and] would not increase the amount of fees paid or owed by the client." *Cohen*, 173 Cal. App. 4th at 320. Because they were terminated prior to the happening of the contingency, Beck & Lee and Reese Richman have no proper claims to fees from either Plaintiffs, the proposed class, or Defendant. Instead, any such claims should be asserted against the Weston Firm in quantum meruit. *See Strong*, 166 Cal. App.

29

4th at 1404 (discharged attorney's claim was against law firm that requested attorney's services, not client); *see also Huskinson & Brown*, 32 Cal. 4th 453. This is especially sensible where there are at least ten different actions at issue under the parties' agreements and it is far more efficient and economical to allow a single court to determine the parties' rights under the two JPAs than to do it piecemeal in at least ten actions.

If the Court enters Beck & Lee's and Reese Richman's terminations, Plaintiffs will quickly finish negotiations for preliminary approval of the settlement with Defendant. Solely the Weston Firm will represent Plaintiffs and be before the Court for its adequacy assessment and class certification decision. Former co-counsel terminated before a class was ever certified, a fee ever approved, or a contingency ever met, must assert any fee claim collaterally against the discharging party in quantum meruit, here, the Weston Firm.

Unilever's suggestion in its filing today that the Court could resolve this dispute by consolidating this action with *Rosen*, previously dismissed with prejudice, or that Mr. Rosen could serve as representative plaintiff in a settlement after the *Red* Plaintiffs are dismissed (*see* Br. at 5-7), is wrong for several reasons. First, with his claims having been dismissed with prejudice and judgment entered against him, Mr. Rosen lacks the Article III standing required of a class representative, much as he would if he settled his case and judgment was entered. *See Doe v. Unocal Corp.*, 67 F. Supp. 2d 1140, 1142 (C.D. Cal. 1999) (standing is a jurisdictional element that must be satisfied prior to class certification and a litigant must be a member of the class he seeks to represent at the time the action is certified). Further, unlike the rest of the proposed class and the three Plaintiffs here with live claims against Unilever, the judgment entered against Mr. Rosen renders him a non-member or at minimum atypical of the proposed class. "Certification of a class action is improper where certification takes place after the proposed class representative is no longer a member of the proposed class." *Zuranski v. Anderson*, 582 F. Supp. 101, 109 (N.D. Ind. 1984)

Second, if the Court does not approve the settlement, Mr. Rosen's uncertified case would revert back to appeal where it could take several years to resolve. Such posture destroys much of his bargaining power and the incentive for Defendant to continue with the settlement. If

30

*Red et al. v. Unilever PLC et al.*, Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN

1  Defendant tried to back out of the settlement, it would leave the class unable to further prosecute

2  the case unless Mr. Rosen prevailed on his appeal.

3      Third, even if these issues did not render Mr. Reese's sole client here unable to serve as a

4  class representative, the Weston Firm is still better equipped than Reese Richman to ensure the

5  settlement is approved. The Red Plaintiffs have one attorney right in Santa Clara and another an

6  hour's flight away in San Diego. Mr. Rosen's two attorneys are both located in New York City

7  and Mr. Richman is not even a member of the California bar. Moreover, while Mr. Reese agreed

8  with the settlement term sheet here, the Weston Firm primarily negotiated the substantive aspects

9  of the settlement (i.e., Unilever's concessions, as opposed to just the attorney fee portion) and is

10  in the best position to negotiate a final settlement. Indeed, Mr. Weston has already sent

11  Defendant's counsel a full 24-page final settlement agreement acceptable to his three clients, and

12  a 16-page joint memorandum of points and authorities in support of preliminary approval of the

13  settlement. Mr. Stern has indicated that the terms of Mr. Weston's proposal will likely be

14  acceptable to Unilever, whose main hesitation about agreeing to it is that Unilever does not want

15  to be later sued by Beck & Lee and Reese Richman, an issue that Mr. Weston attempted to

16  address in his proposed final settlement agreement, and which Plaintiffs believe the Court can

17  prevent.

18      Finally, because the three *Red* Plaintiffs have purchased and challenged a much larger

19  number of Unilever products (seven versus Mr. Rosen's one), the settlement would be less

20  vulnerable to an objection that the proposed release is broader than the initial claims.

21

22                                  **CONCLUSION**

23      A client has the absolute right to terminate an attorney, with or without cause. In this

24  case, there was plenty of cause, including the Becks' erratic and unprofessional behavior and

25  Michael Reese's unreasonable demands for fees. Most importantly, the squabbling among

26  counsel has nearly derailed a tentative settlement in which the most important provision is that

27  Unilever ***must remove a toxic additive from dozens of margarine products***, to the benefit of the

28  health and welfare of millions of American consumers. Thus, the terminations were necessary

31

and amply justified. The Weston Firm explained the situation to each of its clients and obtained their authorization to terminate Beck & Lee and Reese Richman. Because Plaintiffs had the absolute right to authorize that termination, neither terminated firm has standing to "oppose" the termination. And, they are no longer authorized to act on Plaintiffs' behalves. That is solely the Weston Firm's duty and privilege now. Plaintiffs respectfully request the Court deny or strike the Beck's purported "Opposition" to their signed Notice of Termination and enter the same, and find that solely the Weston Firm is authorized to finish negotiations with Defendant.

DATED: September 1, 2010                    Respectfully Submitted,


                                            s/Gregory S. Weston
                                            Gregory S. Weston

                                            **THE WESTON FIRM**
                                            GREGORY S. WESTON
                                            888 Turquoise Street
                                            San Diego, California 92109
                                            Telephone: (858) 488-1672
                                            Facsimile: (480) 247-4553

                                            JACK FITZGERALD
                                            2811 Sykes Court
                                            Santa Clara, CA 95051
                                            Telephone: (408) 459-0305

                                            ***Attorneys for Evangeline Red, Jennifer Red, and Rachel Whitt***

32

*Red et al. v. Unilever PLC et al.*, Case No. 3:10-cv-00387 JW
SUPPLEMENTAL BRIEF CONCERNING TERMINATION OF BECK & LEE AND REESE RICHMAN